RUSSELL A. MORGAN, Plaintiff-Appellant, v. THE DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—07—1058

Opinion filed February 13, 2009.

GORDON, JOSEPH, J., dissenting.

Alan Rhine, of Law Offices of Alan Rhine, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Jan E. Hughes, Assistant Attorney General, of counsel), for appellees.

JUSTICE McBRIDE delivered the opinion of the court:
This is an appeal from an order of the circuit court affirming the revocation of Dr. Russell Morgan's license to practice clinical psychology by the Illinois Department of Financial and Professional Regulation. For the reasons that follow, we affirm.

## I. BACKGROUND
On February 23, 2005, the Illinois Department of Financial and Professional Regulation filed a petition praying for the summary suspension of Dr. Russell Morgan's clinical psychologist license based upon allegations that he engaged in inappropriate sexual conduct with

four of his female patients by touching their breasts and vaginas during treatment sessions. Three of these violations occurred at the Royal Oaks Care Center, a residential facility, in Kewanee, Illinois, with which plaintiff had contracted to provide psychological services to its patients. Because of this conduct, the Department asserted that Dr. Morgan's continued practice of clinical psychology posed an imminent danger to the public and prayed that his license be temporarily suspended pending proceedings before the Clinical Psychologists Licensing and Disciplinary Board. The record on appeal does not reveal whether plaintiff received notice of this petition.

That same day, the Department also filed an administrative complaint against Dr. Morgan alleging, in part, that he engaged in inappropriate sexual behavior with four female patients. The Department specifically alleged that: (1) on or about October 15, 2004, plaintiff placed his hands under the clothing of an 84-year-old patient named H.L., fondled her breast and digitally penetrated her vagina;[1] (2) in or about December 2004, plaintiff instructed a 56-year-old patient named J.L. to lift up her shirt, sucked on her nipple, and placing his finger upon and in her vagina, digitally stimulated her vaginal area; (3) in or about December 2004, plaintiff instructed a 26-year-old patient named K.T. to lie on her bed and listen to relaxation tapes and while she was complying with these instructions, he reached under her blouse and fondled her breast and reached inside her pants and touched her vagina; and (4) in or about December 2004, plaintiff instructed a 38-year-old patient named S.G.-N. to lie on her bed and listen to relaxation tapes, and while she was complying with these instructions, he reached under her blouse and fondled her breast and reached inside her pants and touched her vagina.

The Department alleged that each act of misconduct violated six separate professional regulations and accordingly charged plaintiff with 24 counts of misconduct relating to those acts, six counts per patient. In doing so, the Department relied on its authority under section 15(7) of the Clinical Psychologist Licensing Act (Licensing Act) (225 ILCS 15/15(7) (West 2004)), which grants it the authority to discipline a psychologist for "[u]nethical, unauthorized, or unprofessional conduct as defined by rule." In counts I, VII, XIII, and XIX, the Department sought the suspension or revocation of plaintiff's license

---

[1]After an evidentiary hearing, the administrative law judge found that the Department failed to meet its burden with respect to plaintiff's alleged conduct with H.L. and this recommendation was adopted by the Board and director of the Department. Accordingly, the evidence, as it relates to any alleged misconduct of plaintiff toward H.L., need not be articulated here.

under section 1400.80(i) of Title 68 of the Illinois Administrative Code (68 Ill. Adm. Code §1400.80(i), amended at 28 Ill. Reg. 358, eff. December 19, 2003), which grants the agency the power to discipline a psychologist for committing "any act of sexual misconduct, sexual abuse or sexual relations" with a client or patient.

The Department also filed charges against plaintiff for violating five specific provisions of the "Ethical Principles of Psychologists and Code of Conduct" (2003) (hereinafter Ethics Code) which the Administrative Code incorporates by reference. 68 Ill. Adm. Code §1400.80(k), as amended at 28 Ill. Reg. 358, eff. December 19, 2003. In counts II, VIII, XIV, and XX, the Department alleged that plaintiff's conduct with the four victims violated section 3.03 of the Ethics Code, which proscribes psychologists from knowingly engaging in "behavior that is harassing or demeaning to persons with whom they interact in their work based on facts such as those persons' age, gender, gender identity, race, ethnicity, race, culture, national origin, religion, sexual orientation, disability, language or socioeconomic status." In counts III, IX, XV, and XXI, the Department claimed that plaintiff's conduct violated section 3.04 of the Ethics Code, which requires psychologists to "take reasonable steps to avoid harming their clients/patients *** and to minimize harm where it is foreseeable and unavoidable." In counts IV, X, XVI, and XXII, the Department alleged that plaintiff's conduct violated section 3.08 of the Ethics Code, which proscribes psychologists from exploiting "persons over whom they have supervisory, evaluative, or other authority such as clients/patients." In counts V, XI, XVII, and XXIII, the Department alleged that plaintiff's conduct with these four patients violated section 10.05 of the Ethics Code, which prohibits psychologists from engaging in "sexual intimacies with current therapy clients/patients."[2] In counts VI, XII, XVIII, and XIV, the Department alleged that plaintiff's conduct with these four patients violated section 10.08 of the Ethics Code, which bars psychologists from engaging in "sexual intimacies with former clients/patients for at least two years after cessation or termination of therapy." Counts VI, XII, XVIII, and XIV were subsequently withdrawn by the Department.

The Department also charged plaintiff in counts XXV and XXVI

---

[2]Due to typographical error, counts V, XI, XVII, and XXIII of the complaint originally charged plaintiff with violation of section 10.04 of the Ethics Code, which relates to providing services to patients who are receiving mental health services from other sources. On March 8, 2005, the first day of the administrative hearing, the court granted the Department's motion to amend the counts to charge plaintiff with violating section 10.05 of the Ethics Code.

with failing to maintain proper medical records for patients K.T. and S.G.-N. respectively, in violation of section 6.01 of the Ethics Code, which obligates psychologists to "create, and to the extent the records are under their control, maintain, disseminate, store, retain, and dispose of records and data relating to their professional and scientific work in order to (1) facilitate provision of services later by them or by other professionals, (2) allow for replication of research design and analyses, (3) meet institutional requirements, (4) ensure accuracy of billing and payments, and (5) ensure compliance with law."

On February 23, 2005, an *ex parte* hearing was held before the Department's director on the petition for summary suspension, at which neither plaintiff nor his attorney was present. At the hearing, the director heard the testimony of a department investigator, William Disselhorst, who stated that he investigated the complaints of H.L., J.L., K.T., and S.G.-N., and learned that plaintiff had inappropriately touched their breasts and vaginas and failed to maintain treatment records for K.T. and S.G.-N. He also asserted that based on this conduct, plaintiff posed an imminent danger to the public. On the basis of this testimony, the director found that "the interests of safety and welfare imperatively require[d] emergency action to prevent the continued practice of clinical psychology by the plaintiff and that the plaintiff's actions constitute[d] an immediate danger to the public" and entered an order summarily suspending his license to practice psychology pending proceedings before the Department's Clinical Psychologist Licensing and Disciplinary Board.

On March 8, 2005, an administrative law judge (ALJ) commenced a hearing on the charges against plaintiff that continued on March 9, 10, 16, and April 8, 2005. At that hearing, S.G.-N, one of the Department's complaining witnesses, testified that she moved into the Royal Oaks Care Center in Kewanee, Illinois, on July 17, 2004, and that plaintiff visited her there four or five times in her room. On one of these visits, she claimed that she fell asleep on her bed listening to a relaxation tape given to her by plaintiff and, when she awoke, found plaintiff's hand inside her clothing "playing" with her "privates." She claimed that she was afraid of him because he had told had her that he "was working for the government" and she was afraid that "he was some kind of CIA agent," and went to the bathroom. She soon returned to the bed, however, to "let him finish" because she was afraid he was going to hurt her if she did not. S.G.-N. testified that after the incident she told a fellow resident named Krissy about it and reported the encounter to Angie Harris, an administrator at the home, and Elsie Sall, the facility's director of nursing. S.G.-N. asserted that she had been taking her medications at the time of the incident.

At the conclusion of the direct examination of S.G.-N., plaintiff moved to strike the entirety of her testimony because she did not testify as to when the incident occurred and therefore did not "link" her claims to the allegation in the administrative complaint that the incident occurred "in or about December 2004." In response, the Department stated:

"She has testified to the period during which she has been residing at the home. She testified to the location of the event. Whether the event occurred in July when she was a resident at the home or occurred in any other month, say August, September, October, November, December, January, February, she testified that the event occurred. The event occurred during the period of her residency at the home. It occurred during any potential limitations period. The question of the date on which it occurred is one of simply whether or not there is any type of alibi that the doctor may have. It doesn't go to whether or not the event occurred."

In reply, plaintiff noted that Royal Oaks only engaged his psychological services on September 3, 2004, when the parties entered into a psychological service agreement, which was admitted into evidence, and thus he would have prepared his defense differently had he received notice that the incidents for which he was charged were to have occurred prior to that time. The ALJ denied the motion to strike and the proceeding continued.

On cross-examination, plaintiff asked S.G.-N. if she had been diagnosed with bipolar disorder. The Department objected to the question on grounds that the witness was not a medical doctor, which the ALJ sustained. In response, plaintiff argued that any disorders S.G.-N. suffered were relevant to the ALJ's evaluation of her ability to correctly observe the incident and noted that the Department had asked her about her medications on direct examination. The ALJ stated that the Department did not "mention any particular diseases" and ruled that it was not going to let plaintiff "go into any medical history of this woman," but would allow him to examine S.G.-N. with respect to her medications.

Plaintiff thereupon asked S.G.-N. what medications she was taking at the time of the incident and she stated that she was taking Xanax, Neurotin, and Risperdal. S.G.-N. admitted that patients at Royal Oaks are required to sign consent forms granting the facility permission to administer a particular medication to them and that she had signed some of those forms. Plaintiff then asked her if she was aware that some of the forms that she signed, which were not offered into evidence, stated that her medications could cause side effects including confusion and hallucinations, and she answered in the nega-

tive. Plaintiff offered into evidence a portion of S.G.-N.'s medical record, which contained a report stating that she suffered from "a long history of schizoaffective disorder with intermittent paranoid ideation about being poisoned by her stepfather." Her medical record also included a note stating that on December 26, 2004, the day before she reported plaintiff's conduct, she became loud and belligerent toward facility staff members and indicated that she was paranoid that the staff members were "out to get her."

Plaintiff's attorney then asked S.G.-N. whom she told about the incident and she responded that she informed two administrators at Royal Oaks, Angela Harris and Elsie Sall, a fellow resident named K.T., as well as other individuals whom she could not identify. She did not remember speaking to an investigator or police officer about the incident, but indicated that she could have told a male resident of the facility or a staff member. The cross-examination continued:

"Q. Did you ever give Ms. Harris or anybody on staff at the nursing home a signed statement about the incident?

A. Yes.

Q. Do you remember when you signed that statement?

A. No.

ALJ CANAVAN: Do you want to take—Mr. Rhine, where are you going *** with this?

THE WITNESS: This is ridiculous.

ALJ CANAVAN: What are you trying to prove?

THE WITNESS: This is badgering.

MR. RHINE: Well, the witness isn't able to object to me as badgering. I noticed Mr. Draznin [Department's counsel] hasn't objected to it. I have a statement that purports to be a signed statement by this witness with her account of the—

ALJ CANAVAN: You have already brought out the fact that she's been on medication.

MR. RHINE: Now, this is a signed statement about the incident.

ALJ CANAVAN: Okay. Hurry up and finish this up. This lady has been sitting here for an hour.

MR. RHINE: I'm entitled to represent my client. I have been limited in my examination. I have not been accused by Mr. Draznin of harassing the witness.

MR. DRAZNIN: Yet.

MR. RHINE: I think if you look at the questions I have asked, they have not been excessive and they have not been in any way harassing. But I do want to present full evidence since that is my belief on how I can best represent my client in this matter.

ALJ CANAVAN: All right. Well, continue.

MR. RHINE: Are we taking a break for this witness or can I

show her the statements that I contend she signed regarding the incident that is the subject of this case.

ALJ CANAVAN: Mr. Draznin[?]

Mr. DRAZNIN: I would ask that we take a five minute break.

ALJ CANAVAN: Why don't you get her some water or coffee or something downstairs."

Thereafter a brief recess was had and the ALJ stated, "All right. The witness has been crying for approximately 20 minutes. She's obviously under a great deal of stress, and I am going to limit the cross-examination to 10 or 15 minutes upon the end of our five-minute break." In response, plaintiff's attorney stated, "That is over the objection of Plaintiff who feels that this is cross-examination, Plaintiff's license is at issue, and he should be entitled to flesh out the very vague and general allegations that have been testified to by this witness." The cross-examination of S.G.-N. then continued.

On further examination, plaintiff's counsel asked S.G.-N. about her belief that plaintiff was working for the CIA. and that she claimed he told her he worked for the government prior to the incident. She further admitted that she did not know the date of the incident or what time of day it occurred. She stated that her clothes were not unbuttoned, unzippered, or in any way torn or ripped when she woke up while plaintiff was touching her. The examination continued:

"Q. When you awoke, you got up and went to the bathroom; is that correct?

A. Yes.

Q. And at the time you got up, where was Dr. Morgan's hand?

A. Inside of my underwear.

Q. So even though his hand was inside your underwear, you were able to get up without tearing or ripping your underwear; is that correct?

A. He jerked his hand out of my underwear.

Q. How soon after you woke up did he jerk his hand out of your underwear?

A. You are asking me ridiculous questions.

MR. RHINE: Your Honor, there is no objection from Mr. Draznin on a legal basis. The witness is not in a position to object to my questions.

ALJ CANAVAN: Well, she can answer or not answer it. She can answer it any way she wants. I can't tell her how to answer a question.

MR. RHINE: I think you can advise her that she has to answer.

ALJ CANAVAN: She could answer to the best of her ability. If you could answer the question, please answer. If you don't know the answer or don't know, just say I don't know. Repeat the Question.

MR. RHINE: Could the court reporter read the question back.

(Record read as requested).

THE WITNESS: Probably a second, a couple of seconds. I don't know. I don't really know. I can't take this. This is tearing me apart.

MR. DRAZNIN: Judge, we resumed 12 minutes ago.

ALJ CANAVAN: Okay. Alright. Is [*sic*] there any other follow-up questions you have quickly.

MR. RHINE: Yes, I have questions. For the record, I object to a limitation on my cross-examination of this witness.

ALJ CANAVAN: You have already done that, I think, haven't you? How many questions do you have do you think?

MR. RHINE: It depends on the answers, but I have a few more. I'm still asking questions.

ALJ CANAVAN: I'll give you five more minutes. That's it. ***

MR. RHINE: Do you want me to continue with the witness in her current state or did you want me to take a break?

ALJ CANAVAN: Well, yes, I think you might as well.

MR. RHINE: Okay.

ALJ CANAVAN: It is up to you.

MR. RHINE: I will continue.

THE WITNESS: I can't take this.

ALJ CANAVAN: All right.

MR. RHINE: I would like the record to reflect that the witness did not cry during her direct examination when she addressed the incident.

BY MR. RHINE:

Q. Ms. [N.], after Dr. Morgan jerked his hand out of your underpants, did you get off the bed and go the washroom?

A. I went to—

MR. DRAZNIN: Mr. Rhine is asking questions that the witness has testified to already.

MR. RHINE: On direct, not on cross.

MR. DRAZNIN: And obviously, it does nothing to question credibility to ask the same—to repeat simply the testimony from earlier. If Mr. Rhine has questions that are appropriate, he should ask them. I would object to him simply restating earlier testimony.

MR. RHINE: Judge, I am entitled to ask questions that may have been asked on direct examination during cross-examination.

ALJ CANAVAN: Yes, you are; but you are not entitled to ask them over and over again. I know there's been many objections, but please wrap this up.

Obviously, Ms. [N.] is unable to testify any more unless you have another question that she could answer.

MR. RHINE: Well, I don't think cross-examination is limited to what the witness wants to be asked or answer. I have questions.

THE WITNESS: Do you realize that I have been molested before and when you have been through it so many times, you get kind of used to it happening to you but this ridiculous questioning is absurd.

MR. DRAZNIN: Your Honor, I would ask that that be stricken from the record because there was not question pending; and Judge, if Mr. Rhine wants to continue asking questions while the witness has indicated that she's unable to answer them, then I would simply like the record to reflect that she is sitting her crying and has been crying for most of the last 16 minutes since we came back from break and that if the witness is unable to answer one of the questions Mr. Rhine asks because of her condition on the stand, would the record simply reflect that she's unable to answer them because of her condition.

ALJ CANAVAN: Why don't you talk to the witness.

\* \* \*

MR. DRAZNIN: I've spoken with Ms. [N.] And she has said she's not able to answer any more questions at this time.

ALJ CANAVAN: Would you put something in the record, Mr. Draznin, and you can put whatever objections you may have on in the record, too, Mr. Rhine. At this time, the witness is going to leave the room. Is she going to leave?

MR. DRAZNIN: Yes. Yes.

ALJ CANAVAN: She has been deemed unable to continue testifying under the cross-examination of Mr. Rhine. She's been crying for about half an hour and can't continue any longer.

Mr. Draznin, did you want anything in the record?

MR. DRAZNIN: Judge, I would simply state for the record what you had just said concerning her condition and then at your instruction, I spoke with the witness to find out if she was capable of testifying. I asked her to try to continue, if she could, and she indicated that she's not able to answer any more questions.

\* \* \*

MR. RHINE: I would ask that the witness' testimony be stricken because she was not subject to full cross-examination and she left because of her condition even though I was not allowed to go into her medical condition on cross-examination so she has been allowed to leave the room based on her own determination that she could not continue, and she never testified to a date about when this incident occurred.

The Department is required to give us proper notice about when the alleged incident took place. \* \* \*

So the grounds for striking her testimony are two-fold. No.1, she did not complete cross-examination which limits the defense; and No. 2, she never identified a date of the alleged incident, therefore,

we have gotten improper notice. That again limits us in preparing a defense to the charges.

ALJ CANAVAN: Thank you, Mr. Rhine. That oral motion will be denied."

The Department's next complaining witness, J.L., testified that she was a resident of Royal Oaks and met with plaintiff on December 16, 2004, in the activities office in the facility. J.L. stated that she has certain abnormalities on her breasts, which she related in her conversation with plaintiff and he asked if he could see them. She agreed and when she lifted her blouse, plaintiff grabbed her left breast and "started suckling it like a baby would when it was nursing" and inserted his finger into her vagina. J.L. stated that she told a staff member about the incident 45 minutes after it happened, but could not recall who specifically she told because "this is three months later and I have had different medication put into my system and I've lived on so many medications through the years that I'm lucky to be upright."

The Department also admitted into evidence, over plaintiff's objection, a report drafted by two Illinois State Police investigators after their interview of J.L. on January 11, 2005. The report indicates that the investigators found her to be very lucid and exhibiting normal thought processes. She stated that she had been sexually abused in her past by her father and by two African American boys, and she stated, "I was also abused by a minister, a black man raped me named Jim and two security guards." The report also indicated that J.L. told the investigators that during her second treatment session with plaintiff, she asked him about her nipple abnormalities and he sucked her breast for "maybe one and a half minutes." She stated to police that he then asked her to pull her pants down but she refused, and he put his hand into her pants and touched her clitoris. The report indicates that she told police, "oh this is beautiful. I wanted him to stop, but...he did it long enough for me to orgasm." She told police that he eventually stopped, told her not to tell anyone, and she agreed not to. J.L. also told investigators, however, that "the more I thought about that evening, the more I thought I should tell and he should lose his license." J.L. claimed that K.T. and S.G.-N. told her that plaintiff had done similar things to them.

On cross-examination, J.L. admitted that she had been diagnosed with paranoid schizophrenia and takes, among other medications, Depakote, but denied suffering from "persecutory" delusions. Her medical records were received into evidence and notes included in those records indicated that she suffered from "persecutory" delusions and that she felt unfairly threatened or attacked by others. J.L.

stated on further cross-examination that she informed a nurse on the date of the incident, and that she also told Angie Harris, an administrator at Royal Oaks, about the matter within "a couple of days" and was subsequently interviewed by the Illinois State Police and two other "gentlemen." She stated that she told S.G.-N. and K.T. about the incident the morning after it happened, before she told Harris.

Plaintiff's attorney then asked J.L. whether she had previously told anyone that she reached climax as a result of plaintiff's touching, to which the Department objected on grounds that it was beyond the scope of direct examination and that any such prior statement was not impeaching of her testimony at trial. This objection was sustained by the ALJ. Plaintiff's counsel then asked J.L. if she ever told anyone that she did not tell plaintiff to stop because "it was so beautiful and it felt good," to which the witness was permitted to answer, over the Department's objection, that she told Harris and a priest that "it was beautiful and it felt good." Plaintiff's counsel then asked whether she told anyone other than Harris and the priest that she climaxed during the incident and she replied that Sall, another administrator, was in the room when she told Harris. She also conceded that she told a State Police officer "the more I thought about that evening, the more I thought I should tell and he should lose his license."

K.T., the Department's third complaining witness, testified that she lived at Royal Oaks and met with plaintiff three or four times. K.T. claimed that she met with him on December 16, 2004, in her room and he "got up in my shirt and started feeling my breasts and he got into my pants and started feeling my vagina." He then told her not to say anything about it. K.T. stated that she was taking her medications on the day of the incident and told Sall and Harris on December 27 or 28, 2004.

The Department also offered into evidence, over plaintiff's objection, a report drafted by two investigators from the Illinois State Police, who interviewed K.T. on January 11, 2005. The report indicated that K.T. told the investigators that she had met plaintiff in a courtyard of the facility approximately four weeks before the incident and talked to him on that occasion. K.T. alleged that plaintiff subsequently met with her in her room, and at that time, he touched both of her breasts. She indicated to police that she did not like his touching and he put his hand down her pants and rubbed her clitoris until she told him to stop. The report shows that plaintiff told her not to tell anyone and she told him that she would not. K.T. also told investigators that she had another encounter with plaintiff in her room on December 16, 2004, and at that time, plaintiff made her take

her clothes off and lay completely naked on the bed and again touched her breasts and clitoris. She told him to stop and again he told her not to tell anyone. K.T. told investigators that she did tell a case manager at the facility named Deb Richter within "a couple days after December 16th." She also stated that she spoke with her fellow resident J.L. about their respective encounters with plaintiff, but K.T. insisted that her recollection of plaintiff's conduct with her was not influenced by J.L.'s story.

On cross-examination, K.T. claimed that plaintiff had touched her sexually during his last two visits, the final visit occurring on December 16, 2004. She stated that she expected to see him on December 16, 2004, because he told her that he was going to bring her reading material about her disorders that day. When asked if she kept the documents he gave her, however, she asserted that she did not remember. K.T. denied telling S.G.-N. and J.L. about the incident. K.T. testified that she was taking Depakote, Klonopin, Ativan, but denied that the medications caused her to suffer from confusion or hallucinations. K.T. was then shown various forms that she signed prior to receiving these medications, which were received into evidence, that stated that some of her medications could cause confusion. K.T.'s medical records, which were admitted into evidence, show that she suffers from schizophrenia and auditory hallucinations. She admitted that she suffered from hallucinations, but insisted that she did not hallucinate plaintiff's conduct. K.T. denied that plaintiff told her to take off her clothes and lay completely naked in her bed and disagreed that she told investigators that he did. K.T. acknowledged that she had previously suffered from addictions to alcohol and crack cocaine. She stated that she did not tell plaintiff to stop when he was touching her breasts, but did so when he touched her vagina and he left the room. K.T. later stated that she told him to stop while he was touching her breasts.

On redirect examination, K.T. explained that she could not have hallucinated plaintiff's fondling because her hallucinations are visual in nature and do not give her the sensation of being touched.

The Department called Elsie Sall, the director of nursing at Royal Oak Care Center, who testified that, on December 16, 2004, residents of the facility informed her of plaintiff's actions with S.G.-N., J.L., and K.T. She stated that, thereafter, she called plaintiff several times to request that he submit progress notes in connection with his treatment of S.G.-N. and K.T., which had not been completed as required. In response, plaintiff told her that he did not complete progress notes for the two patients because he had treated them on a *pro bono* basis. Sall claimed that she instructed plaintiff to complete the notes because

they were needed regardless of whether the patients were treated on a *pro bono* basis, but she never received the notes from him.

On cross-examination, plaintiff's attorney asked Sall to review a record maintained by the nurses in the facility which tracked when physicians visited the facility and which patients they saw. After reviewing the document, Sall stated that the document did not show that plaintiff visited S.G.-N. or K.T., but did indicate that he visited J.L. on December 16 and 23, 2004. Sall was then asked about her testimony on direct examination that she was informed of the incidents on December 16, 2004, and she stated that she was so advised on December 27 and 28, when J.L., K.T., and S.G.-N. came to her individually. She claimed that J.L. was the first to inform her of plaintiff's conduct and that K.T. and S.G.-N. separately advised her of their respective encounters with him the next day. Sall testified that after being so informed, she immediately initiated an investigation and reviewed facility records to determine which patients plaintiff had seen. During her review of the charts, she called plaintiff to ask about the progress notes and he admitted that he had seen K.T. and S.G.-N.

The Department also called Dr. Susan Zoline, a licensed clinical psychologist, to testify to the professional ethics applicable to the misconduct charged against plaintiff. Dr. Zoline first testified that section 6.01 of the Ethics Code requires a psychologist to maintain records concerning his treatment of a patient. Plaintiff then stipulated that "it would be a violation of the code of ethics for a psychologist in a professional relationship to fondle a breast, suck a breast, or place his hand in the vagina of a female patient." Dr. Zoline next stated that a psychologist would violate section 3.04, which requires psychologists to "take reasonable steps to avoid harming their clients/patients *** and others with whom they work, and to minimize harm where it is foreseeable and unavoidable," by placing his hand upon the breast of a female client, suck on her nipple or breast, place his hand upon her pelvic area, or insert his finger into her vagina. She further testified that such conduct would violate section 3.08 of the Code, which prohibits psychologists from exploiting "persons over whom they have supervisory, evaluative, or other authority such as clients/patients," and section 10.05 of the Code, which bars psychologists from engaging in sexual intimacies with a patient.

On cross-examination, Dr. Zoline stated that a psychologist is obligated to maintain records concerning the treatment of any individual with whom he or she has a professional relationship. Plaintiff's counsel then asked Dr. Zoline about her interpretation of the phrase "foreseeable and unavoidable" in section 3.04, which requires psychologists to "take reasonable steps to avoid harming

their clients/patients *** and others with whom they work, and to minimize harm where it is foreseeable and unavoidable." Dr. Zoline stated that she interpreted "foreseeable" harm to include harm that a psychologist can foresee will occur, but that is not certain to occur.

Plaintiff's counsel then asked if the phrase "and unavoidable" immediately following the word "foreseeable" changed her interpretation. Dr. Zoline indicated that she did not understand the question and stated, "That is not an issue I'm comfortable answering. *** I'm not a linguist. I'm a psychologist." Plaintiff's counsel then objected, stating that he did not believe it was appropriate for her to avoid answering the question because she was uncomfortable doing so, to which the ALJ responded that Dr. Zoline did not understand the question. Plaintiff's counsel then asked her if she had a professional understanding of the word "unavoidable," the Department's counsel objected on grounds that the question had previously been asked and answered, and the ALJ sustained that objection. Plaintiff's counsel then asked Dr. Zoline about a different rule and then indicated he had no further questions on cross-examination.

Plaintiff testified both as an adverse witness for the Department and on his own behalf. When called by the Department, plaintiff stated that he evaluated J.L. on December 16, 2004, in an office at Royal Oaks, but denied touching her or sucking on her breast. He also reported that J.L. told him that she had made multiple false allegations of sexual abuse against males in the past. Plaintiff acknowledged that he may have spoken to K.T. "for a few minutes here and there," along with other residents who approached him while he was working at the facility, but insisted that he never treated her as a patient, entered her room, or touched her in any way. Plaintiff also denied treating S.G.-N., entering her room, or touching her. He claimed that S.G.-N. approached him while he was working at the facility and told him that "people were touching her, doing things to her, having sex with her, that she smelled like sex." The Department's attorney then asked the circumstances in which S.G.-N. approached him and the following colloquy was had:

> "THE WITNESS: As you're going through the facility through different sections to see people, there are people that are floating and moving out through the environment. They may come up to you anywhere within the facility and ask you something. You could either blow them off say I don't care to talk to you, which this guy may do, or you could talk to them. I did listen to them on occasion throughout weeks of going on. They tell you things. You hear them. You absorb them. You are going to call these people. You are going to ask them things. They are going to say things which are unreli-

able. I'm telling you exactly from the standpoint of a scientist, not a psychotic person who is hallucinating or delusional, who makes up things, makes up lies, makes up police records, everything else under the sun. I'm telling you what I see accurately as a scientist.

Q. You're telling us that as somebody who was disciplined by the Department twice before for sexual misconduct.

MR. RHINE: Objection.

WITNESS: First of all, I didn't do anything wrong. Your Department was wrong. I find your Department to be unreliable, unethical, corrupt and criminal, making things up. I can go through all the points of it but I did nothing. And it is up for civil litigation. We're going to look at that. People made things up. They hid evidence. They didn't introduce evidence that they were supposed to that would have exonerated me. You had investigators lying, making things up, saying they were at a place they weren't at, they talked to people that weren't there and presenting the witnesses that lied to the prosecutor, different lies that my attorney, a former administrative law judge, told me about, and then came into this court told a further different lie and then added a little part of another lie. I have see a lot of this within the context of the Department.

BY MR. DRAZNIN:

Q. Everybody else is lying or delusional?

A. Not everybody else. Some.

Q. The people who were your victims, who have been found to be victims of prior cases were lying, the people who have made the allegations against you in this case are lying or delusional and the Department is corrupt in prosecuting you?

A. Everybody knows the Department is corrupt. You're not an independent judge. You are a judge who works for the Department.

ALJ CANAVAN: Sir, I have had enough of that. Just be responsive to the questions."

During examination by his own counsel, plaintiff reviewed the medical chart of J.L., which was admitted into evidence, and stated that she suffered from bipolar disorder, mixed emotions with psychotic features. Plaintiff explained that this diagnosis indicated that the patient's mood could range from "bipolar, which involves perceiving things that are not there and engaging in risky kinds of behavior for pleasure, to depression." He further stated that the patient suffered from hallucinations and delusions, which involves "hearing things that aren't there, and making things up because the perception is wrong, it is off, it is not reality based." Plaintiff observed that her chart indicated that she suffered from tardive dyskinesia, which is a disorder which can develop when a patient uses antipsychotic medica-

tions for a long period of time and causes unusual mouth and tongue movements.

Plaintiff also testified on his own behalf later in the hearing and claimed that he never had a psychologist-patient relationship with S.G.-N. or K.T. and never entered their rooms. He further denied that he ever told anyone at Royal Oaks that he provided *pro bono* services to patients with the initials S.G.-N. or K.T. Plaintiff acknowledged that he treated J.L. on two occasions and stated that she admitted during his evaluations that she suffered from hallucination and had been diagnosed with schizophrenia and tardive dyskinesia. Plaintiff denied that he ever touched the breasts or vagina of S.G.-N., J.L., or K.T.

Plaintiff called as an adverse witness William Disselhorst, a Department investigator, who stated that he interviewed J.L., K.T., and S.G.-N. in connection with his investigation of plaintiff's conduct. Disselhorst stated that during his interview with J.L., she told him that the incident with plaintiff occurred just before Christmas 2004, during her last treatment session with him, but did not give a specific date. He acknowledged that the report he completed after the interview did not indicate that J.L. stated that the incident occurred during her last treatment session and did not give a specific date that the incident allegedly occurred. Disselhorst asserted that his investigation revealed that J.L. informed Royal Oaks staff of the incident in the last week of 2004.

Disselhorst further testified that during his interview with K.T., she told him that plaintiff fondled her breasts and put his hand in her pants during two treatment sessions, but she did not give specific dates for those sessions. He further asserted that K.T. told him that she told the staff of the facility about plaintiff's conduct before she told other residents. Plaintiff's counsel then asked Disselhorst if K.T. indicated during the interview that "relaxation tapes given to her by Dr. Morgan were used during the sessions that she had with him," and he answered in the affirmative.

Disselhorst also interviewed S.G.-N., who told him that she had three treatment sessions with plaintiff, but she could not remember the specific dates of those sessions. He acknowledged that the report he completed thereafter stated that plaintiff asked her if she wanted to listen to relaxation tapes, she answered affirmatively, and he went to his car to get a cassette tape and cassette tape player. Disselhorst stated that S.G.-N. told him that she was unsure whether plaintiff had penetrated her vagina with his fingers.

Plaintiff then called Angela Harris, who averred that she is the administrator at Royal Oaks and oversees the day-to-day operation of

the facility. She stated that the facility maintains medical records for each of its residents and that care providers, including psychologists, who visit patients at the facility make notations in the resident's chart. Harris testified that the facility investigates all incidents of neglect or abuse and that all aspects of the investigation are documented. She testified that after she was informed of the complaints against plaintiff, she interviewed all residents who had a physician's order to see plaintiff, and then interviewed every other patient after she discovered that he had seen some patients without a physician's order. On December 27, 2004, an "Abuse/Neglect Interview Form" was completed in connection with J.L.'s complaint against plaintiff, and the next day, similar forms were completed in connection with the complaints of K.T. and S.G.-N. All three reports were signed by Harris and submitted into evidence. Harris also identified various medical records for J.L., K.T., and S.G.-N. that were maintained by Royal Oaks, which were admitted into evidence. Harris acknowledged that the facility's records showed that plaintiff visited J.L. on December 23, 2004, and asserted that plaintiff would not be allowed to see J.L. if she had complained of inappropriate conduct before that date.

On June 22, 2005, the ALJ issued its report and recommendations. In doing so, he noted that J.L. testified that in or about December 2004 plaintiff fondled her breasts and vagina during a treatment session, that K.T. testified that in or about December 2004 plaintiff fondled the breasts and vagina while she was listening to relaxation tapes, and that S.G.-N. testified that in or about December 2004 plaintiff fondled the breasts and vagina. The ALJ found this testimony "credible and forthcoming." The ALJ also found that plaintiff failed to compose progress notes in connection with his treatment of K.T. and S.G.-N. for their respective medical files.[3] The ALJ noted that plaintiff's behavior during the hearing was "argumentative, erratic" and that he "challenged the authority of the Administrative Law Judge and the Department's ability to enforce or discipline his license."

The ALJ specifically found that plaintiff's conduct violated: section 1400.80(i) of title 68 of the Illinois Administrative Code (68 Ill. Adm. Code §1400.80(i), amended at 28 Ill. Reg. 358, eff. December 19, 2003), which grants the agency the power to discipline a psychologist for committing "any act of sexual misconduct, sexual abuse or sexual

---

[3]As noted above, the ALJ found that the Department did not prove by clear and convincing evidence the counts against plaintiff with respect to his actions with H.L. (counts I, II, III, IV, V, VI).

relations" with a client or patient (counts VII, XIII, and XIX); section 3.03 of the Ethics Code, which proscribes psychologists from knowingly engaging in "behavior that is harassing or demeaning to persons with whom they interact in their work based on facts such as those persons' age, gender, gender identity, race, ethnicity, race, culture, national origin, religion, sexual orientation, disability, language or socioeconomic status" (counts VIII, XIV, and XX); section 3.04 of the Ethics Code, which requires psychologists to "take reasonable steps to avoid harming their clients/patients *** and to minimize harm where it is foreseeable and unavoidable" (counts IX, XV, and XXI); section 3.08 of the Ethics Code, which proscribes psychologists from exploiting "persons over whom they have supervisory, evaluative, or other authority such as clients/patients" (counts X, XVI, and XXII); section 10.05 of the Ethics Code, which prohibits psychologists from engaging in "sexual intimacies with current therapy clients/patients" (counts XI, XVII, and XXIII); and section 6.01 of the Ethics Code, which obligates psychologists to "create, and to the extent the records are under their control, maintain, disseminate, store, retain, and dispose of records and data relating to their professional and scientific work" (counts XXV and XXVI). On the basis of these conclusions, the ALJ recommended that plaintiff's psychologist's license be revoked for a minimum of five years.

On September 1, 2005, the Department's Clinical Psychologist Licensing and Disciplinary Board entered a two-page order adopting the ALJ's recommended findings of fact and conclusions of law and recommended to the director that plaintiff's license be revoked for five years and that he be ordered to pay an additional fine in the amount of $44,000.

On September 16, 2005, plaintiff filed a petition for rehearing and the Department filed a response on October 12, 2005. On October 31, 2005, the Department filed a motion to set a due date for plaintiff's reply brief, and plaintiff filed his brief on November 1, 2005. On November 17, 2005, the Director denied the motion for rehearing and entered a final decision. He specifically found that because the Board failed to file its recommendation within 60 days of the ALJ's recommendation, he was obligated to base his findings on the recommendations of the ALJ. The Director then adopted the findings of fact, conclusions of law, and recommendation of the ALJ and additionally found that plaintiff showed a disregard for the truth when he stated on cross-examination that he did not know why he had been previously disciplined by the Department and showed a "complete" lack of credibility when he stated that the "Department is unreliable, unethical, corrupt, criminal, and manufactures evidence." The Director

further held that plaintiff's credibility was undermined by the fact that he claimed that he never treated S.G.-N. and K.T., despite Sall's testimony that she called plaintiff to ask for progress notes for those patients and plaintiff told her he did not need to complete such notes because he had treated them on a *pro bono* basis. The Director also stated in his decision: "The testimonies of patients J.L., S.G.-N., and K.T. were lucid and forthright. None of these witnesses displayed an inability to answer questions posed despite their mental illness and use of prescription medication. I find the testimony of each of the witnesses, J.L., S.G.-N., and K.T., regarding the sexual abuse at the hands of the Plaintiff to be credible." On the basis of these conclusions, the Director revoked plaintiff's license for a minimum of five years.

On December 8, 2005, plaintiff filed a complaint for administrative review in the circuit court of Cook County and on March 21, 2007, the court affirmed the Director's decision. Plaintiff now appeals.

## II. ANALYSIS

Administrative decisions made by the Department of Financial and Professional Regulation pursuant to the Clinical Psychologist Licensing Act are subject to judicial review pursuant to the provisions of the Administrative Review Law. 225 ILCS 15/22 (West 2004); 735 ILCS 5/3—101 *et seq.* (West 2004). Under the Administrative Review Law, this court may review "all questions of law and fact presented by the entire record," but may not consider new or additional evidence in making its determination. 735 ILCS 5/3—110 (West 2004). In reviewing the propriety of the Department's decision, the agency's findings and conclusions on questions of fact are deemed to be *prima facie* true and correct. 735 ILCS 5/3—110 (West 2004). Thus, we may not substitute our judgment for that of the administrative agency, but must ascertain whether the findings and decisions of the agency are against the manifest weight of the evidence. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident; if the record contains evidence to support the agency's decision, it should be affirmed. *Abrahamson*, 153 Ill. 2d at 88.

Plaintiff raises numerous claims on appeal. He contends that the Director failed to include in his decision specific findings of fact as required by the Illinois Administrative Procedure Act (5 ILCS 100/1—1 *et seq.* (West 2004)), that the Director's credibility determinations were arbitrary and capricious, and that the Director's conclusion that plaintiff committed various ethical violations by inappropriately touching J.L., K.T., and S.G.-N. was against the manifest weight of the

evidence. Plaintiff further asserts that numerous evidentiary rulings made by the ALJ during the hearing were erroneous. He also claims that the administrative complaint filed by the Department provided him with insufficient notice of the charges against him in contravention of Illinois law and principles of due process. Last, plaintiff contends that his right to due process of law was violated by the Department's failure to enter a final agency decision until November 17, 2005, 222 days after the hearing before the ALJ was completed on April 8, 2005.

## A. Nonconstitutional Arguments

■ We will not reach constitutional issues presented in a case if the matter can be resolved on other grounds (*Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 271 (2004)), and accordingly, we will address plaintiff's nonconstitutional arguments first. Plaintiff initially contends that the Department's findings in this case are so sparse that they failed to meet the requirements of the Illinois Administrative Procedure Act (5 ILCS 100/1—1 *et seq.* (West 2004)). He specifically claims that the Director's decision, which incorporated the ALJ report by reference, was insufficient because it contained "wholly conclusory" credibility findings and did not include an explicit statement of the facts underlying its legal conclusions. Plaintiff further asserts that the Department's decision was arbitrary and capricious because the ALJ report found the testimony of S.G.-N., J.L., and K.T. to be "credible and forthcoming," but did not specifically address the fact that each witness gave prior inconsistent statements to investigators, suffered from mental disorders, and took medication that could possibly cause confusion. We disagree that the Department's findings were inadequate. In that regard, we note, "[a]n agency is not required to make a finding on each evidentiary claim, and its findings need be only specific enough to permit an intelligent review of its decision." *Merrifield v. Illinois State Police Merit Board*, 294 Ill. App. 3d 520, 528 (1997).

In this case, the ALJ summarized the testimony of the complaining witnesses in his statement of facts and stated that he deemed the testimony to be "credible and forthcoming." The ALJ also noted the testimony of Sall that plaintiff failed to complete medical progress notes for S.G.-N.'s and K.T.'s charts and the testimony of Dr. Zoline that plaintiff's conduct breached multiple provisions of the Ethics Code. Based on these findings, the ALJ concluded that the Department had met its burden of establishing that plaintiff had violated numerous regulations governing the conduct of psychologists and recommended that plaintiff's license be revoked.

The Board incorporated the ALJ's recommendations in its decision and the matter proceeded to the Director, who also incorporated the recommendations. The Director made further findings of fact in his decision, finding that plaintiff showed a "disregard for the truth when testifying on cross-examination that he did not know the reason why he had been previously disciplined by the Department," that plaintiff showed "a complete lack of credibility when stating that the Department is unreliable, unethical, corrupt, criminal, and manufactures evidence," that plaintiff's credibility was further damaged by the testimony of Sall that plaintiff admitted to him that he treated S.G.-N. and K.T., that the testimonies of J.L., S.G.-N., and K.T. were "lucid and forthright," and that J.L., S.G.-N., and K.T. did not display "an inability to answer questions posed despite their mental illness and use of prescription medication." When read together, the ALJ report, which was incorporated by reference by the Director's decision, and the Director's additional findings of fact were "specific enough to permit an intelligent review of its decision" and thus complied with the requirements of the Act. *Merrifield*, 294 Ill. App. 3d at 528.

■ Plaintiff next argues that the Director's findings were against the manifest weight of the evidence. He specifically contends that the Director erred in accepting as credible the testimony of K.T., J.L., and S.G.-N. that plaintiff touched them inappropriately even though all three witnesses were impeached by the fact that they suffered from mental disorders, took medication that can cause confusion, and gave prior inconsistent statements to investigators. With regard to S.G.-N., plaintiff specifically notes that her medical records show that she suffers from a schizo-affective disorder with intermittent paranoid ideation about being poisoned and that, on December 26, 2004, the day before she reported plaintiff's conduct, she became loud and belligerent toward facility staff members and indicated that she was paranoid that the staff members were "out to get her." He also observes that S.G.-N. stated at trial that she was afraid of plaintiff because she thought he was "some kind of CIA agent," and that she did not remember meeting with Disselhorst despite the investigator's testimony that he interviewed her. Plaintiff further asserts that S.G.-N.'s claim at trial that she was listening to relaxation tapes when he touched her was impeached by her earlier statements to the facility staff and Disselhorst that plaintiff left the room to get the tapes.

Plaintiff contends that J.L.'s testimony was impeached as well. He notes that her medical records showed that she suffered from delusions, had a history of feeling unfairly threatened or victimized by people, and took medication that could cause confusion. Plaintiff asserts that J.L. also exhibited a poor memory when she stated at trial

that she could not recall the person to whom she reported plaintiff's conduct. He further argues that J.L. was inconsistent in her statements regarding when she met with him, observing that she first testified that she did not see him prior to December 16, 2004, but then changed her testimony to claim that she had. Plaintiff argues that J.L. was also impeached by the fact that she claimed that she did not see him again after her December 16, 2004, meeting, even though facility records showed that he met with her on December 23, 2004. Plaintiff also claims that J.L.'s statements to the Illinois State Police that she had 15 previous sexual encounters and had been abused by two "black boys, a minister, a black man named Jim and two security guards" were incredible, as was her claim that she mentioned her abnormal breasts to plaintiff. Plaintiff asserted that J.L.'s credibility was further undermined by the fact that she claimed at trial that she reported plaintiff's abuse to facility staff within 45 minutes of its occurrence on December 16, 2004, and told the facility administrator within 48 hours, despite the fact that facility records indicate that she was seen by plaintiff on December 23, 2004, and that she did not report the abuse until December 27 or 28, 2004.

Plaintiff contends that K.T.'s testimony was impeached as well. He notes that K.T.'s medical records show that she suffers from schizophrenia and auditory hallucinations, and takes medications that can cause confusion. Plaintiff further observes that K.T. made numerous statements at trial that were inconsistent with earlier statements she made to those investigating her claims. He specifically notes that K.T. told Disselhorst, a Department investigator, that plaintiff made her lie naked on her bed and told police that she was listening to relaxation tapes when he touched her, but recanted both claims at trial. Plaintiff further contends that K.T.'s testimony that plaintiff touched her during two sessions was impeached because the claim was inconsistent with her earlier statement during an interview with facility staff that he touched her during only one session and also contended that her testimony was illogical given the fact that she presumably would refuse to see plaintiff again after he molested her during an earlier session. He also argues that K.T.'s claim that she met with plaintiff on December 16, 2004, so that he could give her documents about her disorders was undermined by the fact that she did not remember if she kept the documents. Plaintiff also notes that K.T. changed her testimony about when she told plaintiff to stop touching her, initially stating that she told him to stop after he touched her vagina, but later saying that she told him to stop after he touched her breasts.

Although the record shows that S.G.-N., J.L., and K.T. suffered

from mental disorders, took medication that could cause confusion, and gave prior inconsistent statements to those investigating plaintiff's conduct, we cannot say that the Director erred in finding credible their claims that plaintiff fondled their breasts and vaginas. We note that it "is for the Director, as the trier of fact, to evaluate all evidence, judge the credibility of witnesses, resolve any conflicts in the evidence, and draw reasonable inferences and conclusions from the facts." *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 561 (2004). The Director may accept or reject as much or as little of a witness's testimony as he pleases. *People v. Sullivan*, 366 Ill. App. 3d 770, 782 (2006). It is not the function of this court to "reevaluate witness credibility or resolve conflicting evidence," but rather to determine only "whether the findings of fact are supported by the manifest weight of the evidence." *Ulysse v. Lumpkin*, 335 Ill. App. 3d 886, 893 (2002).

In this case, the ALJ found the testimony of S.G.-N., J.L., and K.T. to be "credible and forthcoming," and in the final agency decision, the Director stated that he reviewed the record and concluded that their testimony was "lucid and forthright" and that "[n]one of these witnesses displayed an inability to answer questions posed despite their mental illness and use of prescription medication." Furthermore, despite the fact that portions of the witnesses' testimony were contradicted by statements made to investigators before the hearing, the Director found that S.G.-N., J.L., and K.T. credibly testified that plaintiff touched them inappropriately and we will not disturb these credibility determinations on review. *Lumpkin*, 335 Ill. App. 3d at 893.

■ Next, plaintiff argues that the ALJ acted in an arbitrary and capricious manner when he failed to consider the credibility of plaintiff and S.G.-N. in a consistent manner. He observes that the ALJ found plaintiff to be an incredible witness because his behavior during the hearing was "argumentative, erratic" and that he "challenged the authority of the Administrative Law Judge and the Department's ability to enforce or discipline his license," but found S.G.-N.'s testimony to be not erratic despite the fact that she complained that plaintiff's counsel's questions on cross-examination were ridiculous, absurd, and badgering. As noted above, the evaluation of witness credibility lies within the province of the Director. *Anderson*, 348 Ill. App. 3d at 561. In determining the respective credibility of S.G.-N. and plaintiff, the ALJ could have considered their general demeanor on the witness stand, the inflection of their voices, and emotional and physical reactions to questions propounded, considerations that would not be apparent from the written record. *People v. Stankovich*, 119 Ill. App. 2d 187, 194-95 (1970). Even if both S.G.-N. and plaintiff exhibited some

"erratic" behavior on the stand, as plaintiff suggests, such conduct would have been only one factor for the ALJ to consider in determining the credibility of each witness. Therefore, we reject plaintiff's argument that the ALJ was arbitrary and capricious in weighing the respective credibility of S.G.-N. and plaintiff.

■ The testimony of S.G.-N., J.L., and K.T. that plaintiff touched them inappropriately, together with Dr. Zoline's testimony regarding the ethical principles of her profession applicable to the conduct of plaintiff, support the Director's conclusions that plaintiff engaged in sexual intimacies with three patients in violation of section 1400.80 (i) of title 68 of the Illinois Administrative Code (68 Ill. Adm. Code §1400.80(i), amended at 28 Ill. Reg. 358, eff. December 19, 2003), which grants the agency the power to discipline a psychologist for committing "any act of sexual misconduct, sexual abuse or sexual relations" with a client or patient (counts VII, XIII, and XIX), section 10.05 of the Ethics Code, which prohibits psychologists from engaging in "sexual intimacies with current therapy clients/patients" (counts IX, XVII, and XXIII), and section 3.03 of the Ethics Code, which bars psychologists from engaging in behavior that is "harassing or demeaning to persons with whom they interact in their work" based on their gender (counts VIII, XIV, and XX). The evidence also supports the Director's determination that plaintiff violated section 3.04 of the Ethics Code, which requires psychologists to take reasonable steps to avoid harming their patients (counts IX, XV, and XXI). See *Farber v. North Carolina Psychology Board*, 153 N.C. App. 1, 16, 569 S.E.2d 287, 298-99 (2002) (psychologist's suggestion to patient that a romantic relationship was possible between them violated ethical standard, which "admonishes psychologists to 'take reasonable steps to avoid harming their patients or clients...and to minimize harm where it is foreseeable and unavoidable' ").

The evidence supports the Director's conclusion that plaintiff's conduct violated section 3.08 of the Ethics Code, which bars psychologists from entering into exploitative relationships and specifically states that psychologists "do not exploit persons over whom they have supervisory, evaluative, or other authority such as clients/patients" (counts X, XVI, and XXII). The evidence shows that plaintiff used his position as a treating psychologist to gain individual access to S.G.-N., K.T., and J.L. in the privacy of their rooms. Furthermore, J.L. specifically testified that during her treatment session with plaintiff, the subject of her breast abnormalities arose and that she showed plaintiff her breasts after he asked to see them. S.G.-N. claimed she fell asleep on her bed listening to a relaxation tape given to her by plaintiff and, when she awoke, she found plaintiff's hand inside her clothing "play-

ing" with her "privates." This evidence provided a proper basis for the Director to find that plaintiff used his position as a treating psychologist to exploit K.T., J.L., and S.G.-N.

The evidence also supports the Director's conclusion that plaintiff violated section 6.01 of the Ethics Code, which requires psychologists to "create, and to the extent the records are under their control, maintain *** records and data relating to their professional and scientific work." At the hearing, Angela Harris, an administrator at Royal Oaks, testified that the facility maintains medical records for each of its residents and that care providers, including psychologists, who visit patients at the facility make notations in the resident's chart after each visit. Elsie Sall, the director of nursing at the facility, testified that she called plaintiff several times after she learned that he had treated K.T. and S.G.-N. to request that he submit progress notes in connection with those patients, which had not been completed as required. She claimed that after plaintiff told her that he did not complete progress notes for the two patients because he had treated them on a *pro bono* basis, she instructed him to complete the notes because they were needed regardless of whether the patients were treated on a *pro bono* basis, but she never received the notes from him. Thus, the evidence supports the conclusion that plaintiff treated J.L. and S.G.-N. and had access to their charts, but did not maintain a record of his sessions with them as required under section 6.01 of the Ethics Code. Consequently, the Director's conclusions as to counts XXIV and XXV were not contrary to the manifest weight of the evidence.

Plaintiff nevertheless contends that the Director's decision was against the manifest weight of the evidence because the ALJ decision, which was incorporated by reference by the Director, found: (1) S.G.-N. was touched by plaintiff in or about December 2004, even though S.G.-N. never testified as to the date of the incident, (2) K.T. was listening to relaxation tapes when plaintiff touched her, even though K.T. testified that she was not listening to tapes at the time of the incident; and (3) none of the complaining witnesses displayed an inability to answer questions posed despite their mental illness and use of medication, despite the fact that the Department's attorney sought to strike a statement made by S.G.-N. while she was crying on the stand stating, "if the witness is unable to answer one of the questions Mr. Rhine asks because of her condition on the stand, would the record simply reflect that she's unable to answer them because of her condition," and J.L. stated "I've lived on so many medications through the years that I'm lucky to be upright."

We note, however, that even if these specific conclusions of the

Director were in error, the fact remains that the unwavering testimony of the complaining witnesses that plaintiff fondled their breasts and vaginas supports the Director's ultimate conclusion that plaintiff violated various professional regulations by inappropriately touching these patients. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Similarly, these three findings do not undermine the Director's conclusion that plaintiff failed to maintain medical records as required.

■ Plaintiff next contends that the ALJ made numerous erroneous evidentiary decisions that prejudiced him. First, he argues that the ALJ erroneously prevented him from cross-examining S.G.-N. about whether she had been diagnosed with bipolar disorder on grounds that the subject was outside the scope of direct examination. A licensee has the right to cross-examine an adverse witness at an administrative hearing as a matter of fairness (*Abrahamson*, 153 Ill. 2d at 95) and may seek to undermine a witness's credibility based on her mental condition (*People v. Phipps*, 98 Ill. App. 3d 413, 416 (1981)). We note, however, that the ALJ's refusal to allow plaintiff to examine S.G.-N. about her mental condition did not constitute reversible error because he has not demonstrated that he was prejudiced by that decision. *Village of Stickney v. Board of Trustees of the Police Pension Fund*, 347 Ill. App. 3d 845, 852-53 (2004) (Board's decision to exclude cross-examination conducted by party was not reversible error because the party did not show that it was prejudiced by that ruling). In this case, S.G.-N.'s medical records were admitted into evidence which stated that she suffered from "a long history of schizoaffective disorder with intermittent paranoid ideation about being poisoned by her stepfather" and stated that, on December 26, 2004, the day before she reported plaintiff's conduct, she became loud and belligerent toward facility staff members and indicated that she was paranoid that the staff members were "out to get her." This evidence established that S.G.-N. suffered from a mental disease and, accordingly, plaintiff was not prejudiced by the fact that the ALJ did not allow his attorney to ask her about her diagnosis.

■ Next, plaintiff contends that the ALJ erred in allowing Dr. Zoline to avoid answering some of his attorney's questions on cross-examination, thus improperly limiting his cross-examination of the Department's expert witness. He specifically refers to a portion of his attorney's cross-examination when Dr. Zoline was asked about her interpretation of the phrase "foreseeable and unavoidable" in section 3.04, which requires psychologists to "take reasonable steps to avoid harming their clients/patients *** and others with whom they work, and to minimize harm where it is foreseeable and unavoidable." Dr.

Zoline stated that she interpreted "foreseeable" harm to include harm that a psychologist can foresee will occur, but that is not certain to occur. The colloquy continued:

"Q. But does the word 'unavoidable,' does the terminology 'and unavoidable' immediately following 'foreseeable' in any way change your opinion?

ALJ CANAVAN: Do you understand the question?

THE WITNESS: I'm not sure I do.

ALJ CANAVAN: I don't think I understand it either. Do you want to get a Webster dictionary so we can go through each word? I don't understand what you're trying to get at here. I'll let you go on. See if you can answer the question. If you can't answer the question, just say that you can't answer the question.

BY MR. RHINE:

Q. Does the terminology 'and unavoidable' which immediately follows the word 'foreseeable' in any way change your opinion of what the word 'foreseeable' means?

A. I can't answer that question.

Q. Why can you not answer that question?

ALJ CANAVAN: Mr. Rhine, she's answered. She said she cannot answer the question.

MR. RHINE: I want to see if the problem is the way I'm phrasing it or if there's some other reason.

THE WITNESS: I think we're leading into an issue of semantics here. That is not an issue I'm comfortable answering. This feels like a semantic question and it is beginning to move away from asking my judgment about the ethical code. I'm not a linguist. I'm a psychologist.

BY MR. RHINE:

Q. So it's your contention that you would have to be a linguist to understand the terminology 'foreseeable and unavoidable' as used in the code of ethics?

A. No. That's not my contention. I cannot answer your question however.

ALJ CANAVAN: Ask another question, Mr. Rhine.

MR. RHINE: Well, just for the record, I would indicate I don't think it's appropriate for the witness to avoid answering the question because she feels uncomfortable.

ALJ CANAVAN: Well, this witness has testified that she cannot answer your question. She doesn't understand the question.

MR. RHINE: Well, she didn't say that. I think she said she's not a linguist.

THE WITNESS: I take that back. I'll retract that. I do not understand your answer clearly enough to feel that I should answer it.

BY MR. RHINE:

Q. Within the context of this rule, do you as a professional psychologist have an understanding of the word 'unavoidable'?

MR. DRAZNIN: Objection, your Honor, asked and answered.

ALJ CANAVAN: The objection is sustained."

Plaintiff's counsel then asked Dr. Zoline about a different rule and then indicated he had no further questions on cross-examination.

Even if the ALJ improperly limited plaintiff's cross-examination of Dr. Zoline as plaintiff contends, this fact alone would not require the reversal of the Director's decision because plaintiff has not shown that he was prejudiced by this ruling. *Strino v. Premier Healthcare Associates, P.C.*, 365 Ill. App. 3d 895, 902 (2006) ("We will not reverse a judgment based on a ruling on cross-examination unless the court abused its discretion and the ruling prejudiced the appellant"). Plaintiff contends that the ALJ wrongfully deprived his attorney of the opportunity to probe Dr. Zoline regarding her interpretation of the phrase "and unavoidable" in section 3.04, which, as previously discussed, requires psychologists to "take reasonable steps to avoid harming their clients/patients *** and others with whom they work, and to minimize harm where it is foreseeable and unavoidable." We note, however, that the charges of inappropriate touching of K.T., J.L., and S.G.-N. violated the portion of the provision that required plaintiff to "take reasonable steps to avoid harming" his patients and not the latter portion of the section, requiring him to "minimize harm where it is foreseeable and unavoidable," that was the subject of his attorney's examination of Dr. Zoline. Consequently, the ALJ's ruling limiting the cross-examination of Dr. Zoline as to the latter portion, even if erroneous, provides no basis for the reversal of the Director's decision.

■ Plaintiff next asserts that the ALJ erred in refusing to allow his attorney to cross-examine J.L. regarding her earlier statement to Harris that she climaxed while plaintiff was touching her vagina, which was memorialized in an "Abuse/Neglect Interview" form completed by Harris on December 27, 2004. This claim, however, is belied by the record. After a brief colloquy, the ALJ permitted plaintiff's counsel to ask J.L. whether she told anyone that she did not ask plaintiff "to stop because it was so beautiful and it felt good" and the witness stated that she told Harris and a priest that "it was beautiful and it felt good." Plaintiff's counsel was also permitted to ask J.L. whether she told anyone other than Harris and the priest that she climaxed during the incident and she replied that Sall was in the room when she told Harris. Thus, the record reveals that plaintiff's counsel was able to ask J.L. about her prior statement to Harris and plaintiff's argument that the ALJ prevented this examination fails.

■ Plaintiff next argues that the ALJ erred in allowing into evidence, over his objection, reports completed by the Illinois State Police and the Streator police department during the course of their investigations of plaintiff's interactions with K.T. and J.L. because the documents contained inadmissible hearsay statements the two patients made to police. In its brief, the Department concedes that police reports were not admissible under the hearsay rule, but correctly observes that the improper admission of hearsay evidence does not constitute prejudicial error if there is sufficient competent evidence to support the Director's decision. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 94 (1992). In this case, as noted above, the statements of J.L. and K.T. contained in the police reports elaborate on the testimony of the two women at the hearing that plaintiff touched them inappropriately, and thus plaintiff was not prejudiced by their admission.

■ Plaintiff next contends that S.G.-N.'s testimony should have been stricken because he was not afforded the opportunity to complete his cross-examination of the witness. As noted above, while plaintiff's counsel cross-examined S.G.-N., the witness started to cry and a recess was called for her to regain her composure. At the recess, the ALJ told plaintiff's counsel that he would allow him to cross-examine her for an additional 15 to 20 minutes. Twelve minutes after the cross-examination resumed, S.G.-N. stated "I can't take this. This is tearing me apart," and the ALJ directed plaintiff's counsel to quickly finish his cross-examination. Plaintiff's counsel told the ALJ that he had a "few more questions" and asked one more question before S.G.-N. left the stand because she was unable to continue.

While a witness's testimony on direct examination must generally be stricken if the witness is not subjected to cross-examination, when a witness is unable to sit for complete cross-examination due to illness, her direct testimony need not be stricken if that cross-examination has been substantially completed. *Marcotte v. Harrison*, 443 A.2d 1225, 1233-34 (R.I. 1982), quoting E. Cleary, McCormick on Evidence §19, at 45-46 (2d ed. 1972) (no error in admitting into evidence deposition of deceased individual even though she was not subjected to complete cross-examination before close of deposition testimony because record showed that the cross-examination was " 'so substantially complete as to satisfy the requirement of opportunity to cross-examine' "); *Fuller v. Rice*, 70 Mass. (4 Gray) 343, 345 (1855) (if cross-examination of witness is substantially complete, "and the witness is prevented by sickness or death from finishing his testimony ***, it ought not to be rejected, but submitted to the jury with such observations as the particular circumstances may require"); *Banks v.*

*Commonwealth*, 312 Ky. 297, 300, 227 S.W.2d 426, 427 (1950) (court did not abuse its discretion in refusing to discharge jury after prosecution witness collapsed during cross-examination because "cross-examination was, to all intents and purposes, completed when the witness collapsed"); 5 J. Wigmore, Evidence §1390, at 134-36 (Chadbourn rev. ed. 1974) ("where the death or illness prevents cross-examination under such circumstances that no responsibility of any sort can be attributed to either the witness or his party, it seems harsh measure to strike out all that has been obtained on the direct examination"; by general concession, courts hold that "a cross-examination begun but unfinished suffices if its purposes have been substantially accomplished").

In this case, plaintiff's counsel was afforded a substantial opportunity to cross-examine S.G.-N. After the Department asked S.G.-N. approximately 40 questions on direct examination, plaintiff's counsel was permitted to ask approximately 85 questions on cross-examination and was allowed to inquire about the side effects of her medications, her prior outbursts with facility staff, her belief that plaintiff was a CIA agent, and specific details of the incident itself. Plaintiff's counsel was also able to establish that S.G.-N. did not remember her interview with Investigator Disselhorst and could not recall the date or time of her encounter with plaintiff. Just before the cross-examination was halted, plaintiff's counsel admitted to the ALJ that he only had a "few questions" left to ask. Because plaintiff's cross-examination of S.G.-N. was substantially completed when she left the stand, her testimony on direct examination need not be stricken.

We further note that even if the testimony of S.G.-N. were stricken, plaintiff's suspension would nevertheless be warranted by his proven abuse of K.T. and J.L. Therefore, plaintiff has failed to show that the result of the hearing would have been different had the testimony of S.G.-N. been stricken as he contends.

## B. Constitutional Arguments

■■■ Plaintiff next argues that the administrative complaint provided him with insufficient notice of the charges against him in contravention of Illinois law and principles of due process. He specifically contends that the Department was required to allege the specific dates of plaintiff's inappropriate conduct with J.L., K.T., and S.G.-N. We note, however, that the Illinois Administrative Procedure Act requires only that the complaint contain "a short and plain statement of the matters asserted." 5 ILCS 100/10—25(4) (West 2004). Furthermore, in order to satisfy due process requirements, "charges filed before an administrative agency need not be drawn with the precision

required of pleadings in judicial actions," but instead "need only be drawn sufficiently so that the alleged wrong-doer is reasonably apprised of the case against him to intelligently prepare his defense." *Rasky v. Department of Registration & Education*, 87 Ill. App. 3d 580, 585 (1980). Due process "is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand." *Siddiqui v. Department of Professional Regulation*, 307 Ill. App. 3d 753, 760 (1999).

Here, the complaint set forth allegations that "in or about December 2004," plaintiff: (1) "engaged in the inappropriate sexual touching of *** J.L., in that he instructed her to lift her shirt; he sucked on her nipple; and he placed his finger upon and in her vagina and digitally stimulated her vaginal area"; (2) "engaged in inappropriate sexual touching of a twenty-six-year-old, female patient, K.T., in that after providing relaxation tapes to K.T., he instructed her to lie upon her bed listening there and while K.T. was following such instructions, he put his hand under blouse and fondled her breast and placed his hand inside her pants and upon her vagina"; and (3) "engaged in the inappropriate sexual touching of a thirty-eight year-old, female patient, S.G.-N., in that after providing relaxation tapes to S.G.-N., he instructed her to lie upon her bed listening thereto and while S.G.-N. was following such instructions, placed his hand inside her pants and upon her vagina."

In determining whether plaintiff has adequate notice of charges brought by an administrative agency, "the court may consider the discovery and other materials available to the plaintiff." *Siddiqui v. Department of Professional Regulation*, 307 Ill. App. 3d 753, 760 (1999) (although administrative complaint charging that doctor improperly allowed another individual to use his medical license did not allege specific dates that the individual saw patients, doctor's due process right to notice was not violated because he was given a list of patients and could have discovered those dates from his medical records). In this case, plaintiff conceded at the hearing that he treated J.L., and his attorney acknowledged that he possessed her medical records in a discovery disclosure sent to the Department on March 7, 2005, the day before the hearing began. The records, which were attached to plaintiff's disclosure, include a notice of privacy rights signed by J.L. on December 16, 2005, and a note indicating that plaintiff examined her on December 16, 2004. From these documents, plaintiff could have reasonably determined the date he saw J.L. and therefore determined the specific date the incident allegedly took place. *Siddiqui*, 307 Ill. App. 3d at 760.

The record also contains a memorandum dated March 3, 2005,

which indicates that the Department sent plaintiff's attorney a series of investigative reports completed during the investigation of the claims against plaintiff. One investigative report, completed by an investigator with the Illinois State Police, indicates that K.T. told the investigator that plaintiff touched her on December 16, 2004, and that J.L. told her that plaintiff had done the same thing to her that same day. From this report, plaintiff could have learned the specific date K.T. alleged the incident took place. *Siddiqui*, 307 Ill. App. 3d at 760.

Although the record does not reveal that plaintiff received any notice of the date of the incident with S.G.-N. aside from the complaint that alleged the incident took place "in or about December 2004," that notice was sufficient to reasonably apprise him of the case against him so as to allow him to intelligently prepare his defense. *Talman v. Department of Registration & Education*, 78 Ill. App. 3d 450, 455-56 (1979) (complaint in administrative action brought pursuant to Pharmacy Practice Act (Ill. Rev. Stat. 1975, ch. 91, par. 55.7—6) gave pharmacist adequate notice of charges against him even though it alleged that he had improperly dispensed 194 bottles of a controlled substance to a single family in an eight-month period and dispensed 1,000 tablets of another drug during a one-year period). As noted above, due process is a "flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand" (*Siddiqui*, 307 Ill. App. 3d at 760), and we cannot say that in light of all the information plaintiff was given about the claim of S.G.-N., that the notice was insufficient simply because the Department gave a general time period in which the incident occurred, instead of a specific date.

In making this determination, we reject plaintiff's interpretation of *Burns v. Police Board*, 104 Ill. App. 3d 612 (1982), which he reads to support the proposition that a complaint in an administrative action must allege a specific date of an incident of misconduct. There the court held that a police officer received insufficient notice of the charges against him because, although he was given the date of the alleged transgression, he was given only the vague allegation that he took "a bribe" or "a sum of money" from "aliens," and was not informed of the location of the occurrence, a time frame in which it took place or the name or description of the victim. *Burns*, 104 Ill. App. 3d at 615. In this case by contrast, plaintiff received the initials and a description of each victim, and detailed descriptions of his alleged conduct with each victim. Furthermore, plaintiff was able to review police reports, medical records, and other documents prior to the hearing, which helped him to prepare his defense.

We also find misplaced plaintiff's reliance on *Kalman v. Walsh*,

355 Ill. 341, 346-47 (1934), which reversed the Department of Registration and Education's suspension of the licenses of three dentists on grounds that the Department lacked jurisdiction to execute such discipline because the dentists were not notified of specific charges against them as was required by statute, but were instead given notice that they were to attend a "hearing in the nature of an inquisition similar to any investigation by a grand jury." In making this decision, the court noted:

> "While it is not necessary that charges of professional misconduct *** should be drawn with the same accuracy and certainty as an indictment or information in a criminal case or with the refinements, niceties and subtleties of the pleadings in courts of record, yet such charges should be so drawn as to bring the alleged act of misconduct clearly within the purview of the statute and should specify the time and place when and where such prohibited act was committed. The right to proper notice and a sufficient and explicit charge is not procedural but substantive. In the absence of such charges being filed, the State Board of Dental Examiners would have no jurisdiction either to proceed with the hearing against the accused or to make a decision therein." *Kalman v. Walsh*, 355 Ill. at 346-47.

In this case, by contrast, the complaint contained specific allegations of misconduct, specific citations to regulatory provisions alleged to have been violated, and a general time period, "in or about December 2004" in which they were alleged to have occurred. Thus, the administrative complaint and subsequent discovery materials plaintiff received prior to the hearing provided plaintiff with adequate notice of the charges against him.

■ Next, plaintiff contends that the Department violated his right to due process by failing to issue a final agency decision in a prompt manner. He notes that the Director summarily suspended his license after an *ex parte* hearing, at which only a Department investigator testified, based merely on the fact that the Department showed that it possessed evidence "that the continuation of practice by the clinical psychologist would constitute an imminent danger to the public." 225 ILCS 15/21.6 (West 2006). Plaintiff contends that because the Director summarily suspended his license on the basis of such cursory proof, the Department was obligated under principles of due process to afford to him a prompt hearing on the matter, at which the Department would be required to prove the allegations against him by a preponderance of the evidence, and to promptly issue a final decision on the matter. He does not assert that he was deprived of a prompt hearing, but insists that the Department violated his right to due

process by unjustifiably and unreasonably taking 222 days to issue a final agency decision while his license remained suspended on a summary basis, depriving him of the ability to practice his chosen profession.

In support of this argument, plaintiff cites our supreme court's decision in *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264 (2004). In that case, the Department of Children and Family Services received a report that Lyon, a high school chorus teacher, had abused two students. *Lyon*, 209 Ill. 2d at 268. On April 11, 2000, the Department completed its investigation of those claims, determined that they were supported by "credible evidence," and as a result listed Lyon as an "indicated" child abuser on the State Central Register. *Lyon*, 209 Ill. 2d at 268. Lyon was informed of this listing on July 19, 2000, and on August 29, 2000, he appealed, seeking the expungement of his name from the register. *Lyon*, 209 Ill. 2d at 268. On September 13, 2000, the Department denied Lyon's request, and on September 15, 2000, he requested an evidentiary hearing before an ALJ. *Lyon*, 209 Ill. 2d at 268. An evidentiary hearing on the matter commenced on November 1, 2000, but was not completed until January 24, 2001, due to two continuances—one by agreement of the parties and another necessitated by an automobile accident involving the ALJ. *Lyon*, 209 Ill. 2d at 268-69. On February 9, 2001, the administrative law judge found the claims substantiated as to one of the children and on March 23, 2001, the Director of the Department issued his decision adopting the conclusions of the ALJ. *Lyon*, 209 Ill. 2d at 269. Lyon filed a complaint in the circuit court seeking administrative review, the circuit court set the Department's decision aside for a discovery violation, and the appellate court affirmed, but on different grounds. *Lyon*, 209 Ill. 2d at 269-70.

On appeal, the supreme court affirmed the appellate court's decision on grounds that Lyon's due process rights were violated by the combination of the Department's use of the credible-evidence standard to initially determine that he was an "indicated" offender and the Department's delays in issuing its final resolution of the administrative appeal. *Lyon*, 209 Ill. 2d at 282-83. In reaching this decision, the court observed that "state" procedural deadlines provide a useful reference in determining whether the time taken by an agency to issue its final decision violates principles of due process, and noted that the Department was required by statute to issue its final agency decision within 45 days of the end of the evidentiary hearing and within 90 days of the request for the hearing. *Lyon*, 209 Ill. 2d at 274-75. The court found that the Department failed to meet these requirements, noting that even after taking into account the two continuances of the

hearing, the Director issued his decision 58 days after the end of the hearing and 117 days after the hearing request. *Lyon*, 209 Ill. 2d at 275-76.

The court then observed that, in order to determine whether an agency's failure to comply with a procedural provision offends due process, the court should consider: "the importance of the private interest and the harm to the interest because of the delay; the government's justification for the delay and its connection to the underlying government interest; and the likelihood that the interim decision may be mistaken." *Lyon*, 209 Ill. 2d at 277, citing *Federal Deposit Insurance Corp. v. Mallen*, 486 U.S. 230, 242, 100 L. Ed. 2d 265, 279, 108 S. Ct. 1780, 1788 (1988). Applying these factors, the court held that Lyon had a significant interest in not having his name placed on the Department's registry because it jeopardized his teaching career, and further found that he had "a significant interest in obtaining a hearing and a final decision in a prompt and efficient manner," so that the report, if mistaken, could be expunged as quickly as possible in order to minimize its damaging impact. *Lyon*, 209 Ill. 2d at 277-78. The State, the court noted, possessed a similarly significant interest in protecting the welfare of children with the utilization of its register. *Lyon*, 209 Ill. 2d at 278. With regard to the reasonableness of the Department's delay, the court noted that the issue could not be resolved merely by comparing the length of the delay to delays in other cases, but that the standard of proof involved must also be considered. *Lyon*, 209 Ill. 2d at 278.

The court then turned to the last *Mallen* factor, the "likelihood that the interim decision may be mistaken," and considered whether the Department violated Lyon's right to due process by utilizing the credible-evidence standard in deciding to initially list Lyon as an "indicated" offender on its register in light of the agency's failure to strictly comply with the procedural deadlines for issuing its final decision. *Lyon*, 209 Ill. 2d at 278-79. In doing so, the court observed that the risk of an erroneous decision is directly related to the standard of proof applied in a particular proceeding—when a higher burden of proof is applied, the risk of finding an innocent person guilty decreases and the risk of acquitting a guilty person increases. *Lyon*, 209 Ill. 2d at 279. In the context of the protection of children from sexual abuse, the court concluded that "it is appropriate to place more of the risk of error on adults, who may suffer mistaken employment hardship, than on children, who may suffer additional abuse." *Lyon*, 209 Ill. 2d at 279. The court noted, however, that the application of the credible-evidence standard, which required only that the Department find that " 'the available facts, when viewed in light of the surrounding

circumstances, would cause a reasonable person to believe that a child was abused or neglected,' " placed a "not insignificant" risk that the indicated finding was erroneous entirely upon the subject of an indicated finding. *Lyon*, 209 Ill. 2d at 279-81, quoting 89 Ill. Adm. Code § 300.20, amended at 29 Ill. Reg. 21065, eff. December 8, 2005. The court nevertheless found this risk of error permissible, holding:

"[T]he use of the credible-evidence standard to indicate a report and to consider a first-stage appeal does not automatically deprive a subject of due process because the second-stage appeal is conducted under the more stringent preponderance standard. [Citation.] By using a weaker standard of proof, the state is equipped to respond more quickly to allegations of abuse and neglect. We find that it is constitutionally acceptable to place the entire risk of error, through use of the credible-evidence standard, on the subject for the finite period of the administrative appeal because the appeal is finally determined under the preponderance standard, which balances the risk of error equally." *Lyon*, 209 Ill. 2d at 282.

The court continued:

"Nevertheless, this distribution of the risk of error becomes problematic when the subject is not accorded a prompt appeal. We conclude that it is constitutionally inappropriate to allow indicated reports based on credible evidence, with their damaging effects on subjects, to persist past the deadlines the General Assembly and the Department itself decided to impose upon the administrative appeals process given the high risk of error inherent in the use of the credible-evidence standard. Thus, we *** hold that a subject's due process rights are violated by the use of the credible-evidence standard to indicate a report and to resolve a first-stage appeal when combined with delays in the final resolution of the administrative appeal." *Lyon*, 209 Ill. 2d at 282-83.

The court then rejected the Department's claim that this holding was too inflexible because the applicable administrative provisions themselves allowed for some flexibility in the conduct of the proceedings. *Lyon*, 209 Ill. 2d at 283. The court stated:

"[W]e require strict statutory and regulatory compliance only if the Department uses the credible-evidence standard to indicate a report and to consider a first-stage appeal. *** If strict compliance is too burdensome, the Department is free to amend its regulations to, for example, require the preponderance of the evidence standard throughout to provide subjects with due process. [Citation.] The Department has a choice: (1) apply the credible-evidence standard to indicate a report and to decide a first-stage appeal and comply with applicable statutory and regulatory provisions; or (2) apply the preponderance-of-the-evidence standard during all stages of

inquiry and provide reasonable process, which is not dependent on compliance with all requirements during the administrative appeal. Either option strikes an appropriate balance between the competing interests of subjects and children, by placing the risk of error to a slightly greater degree on subjects, to reflect our characterization of the societal importance of these interests." *Lyon*, 209 Ill. 2d at 283-84.

Applying the principles of *Lyon* to the case at bar, we conclude that the Department did not violate plaintiff's right to due process by issuing its final agency decision approximately 222 days after the conclusion of the hearing before the ALJ. In reaching this conclusion we initially note that plaintiff had a substantial interest in being able to continue the practice of his chosen profession and that interest is protected by the due process clause of the fourteenth amendment. *Lyon*, 209 Ill. 2d at 272 (" 'It is a well-established constitutional principle that every citizen has the right to pursue a trade, occupation, business or profession. This inalienable right constitutes both a property and liberty interest entitled to the protection of the law as guaranteed by the due process clauses of the Illinois and Federal constitutions' "), quoting *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton*, 105 Ill. 2d 289, 297 (1985). Under *Lyon*, once the Director summarily suspended his license to practice clinical psychology, based only on the fact that the Department had shown that it possessed evidence "that the continuation of practice by the clinical psychologist would constitute an imminent danger to the public," the Department was obligated to issue a final agency decision in strict compliance with applicable statutory and procedural requirements.

In this case, however, the Department was not required by statute to issue its decision within a precise number of days, as was the Department of Children and Family Services in *Lyon*. See *Lyon*, 209 Ill. 2d at 275 (Department required by statute to issue its final agency decision within 45 days of the end of the evidentiary hearing and within 90 days of the request for the hearing). Indeed, the Licensing Act does not provide for any deadlines in the administrative proceedings, except for requiring that the Board issue its recommendation to the Director within 60 days of the date that the ALJ issues his recommendation. See 225 ILCS 15/16.1 (West 2004) ("The Board shall have 60 days after receipt of the report to review the report of the hearing officer and to present its findings of fact, conclusions of law and recommendations to the Director"). We note, however, that section 15.2 of the Licensing Act (225 ILCS 15/15.2 (West 2004)), incorporates by reference the Illinois Administrative Procedure Act (5 ILCS 100/1—1

*et seq.* (West 2004)). Section 10—65(d) of the Illinois Administrative Procedure Act, in turn, provides:

"[N]o agency shall revoke, suspend, annul, withdraw, amend materially, or refuse to renew any valid license without first giving written notice to the licensee of the facts or conduct upon which the agency will rely to support its proposed action and an opportunity for a hearing in accordance with the provisions of this Act concerning contested cases. \*\*\* If, however, the agency finds that the public interest, safety, or welfare imperatively requires emergency action, and if the agency incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. Those proceedings shall be *promptly instituted and determined.*" (Emphasis added.) 5 ILCS 100/10—65(d) (West 2004).

Thus, although the Department's determination of plaintiff's case was not required by a specific deadline, the Director was required to issue a final agency decision in a prompt manner.

In this context, the word "promptly" has been defined as "*without appreciable delay.*" *Barry v. Barchi*, 443 U.S. 55, 66, 61 L. Ed. 2d 365, 376, 99 S. Ct. 2642, 2650 (1979) (holding that after state agency imposed interim suspension on harness racing trainer based upon the unilateral testimony of a state official, the agency was required under principles of due process to afford trainer a "prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay"). Furthermore, Black's Law Dictionary states that "the meaning of the word ['prompt'] depends largely on the facts in each case, for what is 'prompt' in one situation may not be considered such under other circumstances and conditions. To do something 'promptly' is to do it without delay and with reasonable speed." Black's Law Dictionary 1214 (6th ed. 1990).

In the case at bar, we believe that the Department decided plaintiff's case in a prompt manner. We note that, under the Licensing Act, the administrative procedure consists of three steps—the matter is first heard by an administrative law judge who considers the evidence and issues a recommendation to the Board, then the Board reviews the matter and issues its own recommendation, and finally the Director considers the Board's decision and issues a final agency decision. 225 ILCS 15/16.1 (West 2004). In this case the ALJ, Board, and Director took 75, 71, and 77 days, respectively, to finish their administrative responsibilities. When the administrative process is viewed overall, the 222 days taken by the Department may be considered "prompt."

Turning first to the ALJ, we observe that he issued his decision

within 75 days of the end of the hearing, a period we find to be reasonable under the circumstances. We note that the ALJ in this case was required to consider 22 counts against plaintiff, which together alleged the violation of 7 different ethical guidelines. In reaching his conclusions, the ALJ had to weigh the testimony of four complaining witnesses, each of whom suffered from serious mental illness. Before making credibility determinations as to these witnesses, the ALJ had to take a reasonable period of time to familiarize himself with each woman's medical records and prescription drug forms and consider their testimony in light of that evidence. We also observe that a transcript of the parties' closing arguments on the last day of the hearing was not produced by the court reporter until 21 days later. Those arguments, during which the parties' attorneys marshaled and analyzed the evidence presented, would have been particularly useful to the ALJ given the substantial amount and complicated nature of evidence he was required to consider. Although plaintiff argues that the Department retained the court reporter and thus could have controlled the speed of the transcription, the record on appeal contains no evidence to support this contention. Overall, under the circumstances presented, we believe the ALJ acted with "reasonable speed" in issuing his recommendation and thus acted with sufficient promptness.

Similarly, we believe that the Director acted with sufficient promptness in executing his duties within 77 days considering the fact that plaintiff filed a motion for rehearing 15 days after the Board issued its recommendation and the Director decided the motion and issued his final ruling within 16 days after plaintiff filed his reply brief. We observe that the Licensing Act does not provide a movant with authority to file a brief in support of his motion for rehearing and that the rules of practice governing administrative hearings for the Department merely provide that when a written motion such as a motion for rehearing is filed, the "Director may allow oral argument if this is deemed necessary to a fuller understanding of the issues presented." 68 Ill. Adm. Code §1110.210(b), amended at 28 Ill. Reg. 7642, eff. May 21, 2004. However, because plaintiff filed a brief with his motion for rehearing, fairness required that the Department be given an opportunity to submit a brief as well, which it did 26 days later. Plaintiff filed a reply 20 days later, apparently of his own free will.[4] Thus, if we subtract the 46 days between the date plaintiff filed his motion for

---

[4]Although the record contains a motion filed by the Department on October 31, 2005, requesting the Director to set a due date for plaintiff's reply brief, it does not appear that the Director ever ruled on the motion.

rehearing and the date he filed his reply brief in support thereof, the Director took 31 days to complete his work, a period of time that was entirely reasonable given the complexity of this case.

Plaintiff contends, however, that the Director should have decided the case more promptly because he was required to begin his deliberations 60 days after the ALJ issued his decision, regardless of whether the Board took more time to reach its decision. In support of this proposition, he cites section 16.1 of the Licensing Act, which states: "The Board shall have 60 days after receipt of the report to review the report of the hearing officer and to present its findings of fact, conclusions of law and recommendations to the Secretary. If the Board fails to present its report within the 60 day period, the Secretary may issue an order based on the report of the hearing officer." 225 ILCS 15/16.1 (West 2006). We find plaintiff's argument unpersuasive. The provision does not obligate the Director to begin his deliberations 60 days after the ALJ issues his recommendation, but merely provides that the Director "may" issue an order based on the ALJ's recommendation if the Board does not do so. Thus, the language is permissive, leaving to the Director's discretion whether to issue his decision based upon the ALJ's recommendations or wait until the Board issues its decision to begin his deliberations. See *People v. Reed*, 177 Ill. 2d 389, 393 (1997) ("Legislative use of the word 'may' is generally regarded as indicating a permissive or directory reading, whereas use of the word 'shall' is generally considered to express a mandatory reading"); *People v. Resnick*, 373 Ill. App. 3d 163, 165 (2007) (use of permissive "may" in section 5—5—6(e) of the Unified Code of Corrections (730 ILCS 5/5—5—6(e) (West 2004)), which provides that when restitution is ordered, "[t]he court may require the defendant to apply the balance of the cash bond, after payment of court costs, and any fine that may be imposed to the payment of restitution" indicates that "the payment of restitution from a defendant's bail bond lies within the discretion of the trial court"); *Owens v. Snyder*, 349 Ill. App. 3d 35, 44 (2004) (trial court had discretion to deny complaint for *mandamus* even though defendant failed to challenge it because section 14—103 of the Code of Civil Procedure (735 ILCS 5/14—103 (West 2002)) provides that " '[i]f the defendant defaults, judgment by default *may* be entered by the court.' " (Emphasis in original.)). Therefore, we reject plaintiff's argument that the Director did not act promptly because he waited for the Board to reach its decision before beginning his deliberations.

Having determined that the ALJ and Director acted promptly as required by statute, we turn next to the conduct of the Board. Although the Board took 11 more days to complete its responsibilities than the 60 days allotted to it by statute (225 ILCS 15/16.1 (West

2006)), this delay, in and of itself, did not deprive plaintiff of his right to due process. We observe that the Board was obligated to decide the case at an open meeting under section 2 of the Open Meetings Act (5 ILCS 120/2 (West 2004)), which states that "[a]ll meetings of public bodies shall be open to the public" unless otherwise specified by statute. The Department observes that the Board's first regularly scheduled meeting after the ALJ's June 22, 2005, recommendation was issued did not occur until July 29, 2005. Although an argument could be made that it was unreasonable for the Board to wait such a long period before meeting in light of the fact that it could have rescheduled the meeting for an earlier date, such an amendment in the meeting schedule would have required the Department to publish a notice of the change 10 days prior to any such meeting in an area newspaper of general circulation (5 ILCS 120/2.03 (West 2004)). If we were to require the Department to undertake such a step every time an ALJ issued his decision soon after a Board meeting, the expense to the Department could become unduly burdensome. Furthermore, the record shows that the Board members had each reviewed the extensive record by the time they met, which allowed them to make an oral decision on the matter at the July 29, 2005, meeting.

Plaintiff argues, however, that the Board failed to explain why, if it reached its decision on the matter on July 29, 2005, it failed to issue its two-page decision until September 1, 2005. We do not believe that it was clearly unreasonable for the Board to take 34 days to issue a written ruling. We note that the Board did not merely adopt the recommendation of the ALJ, but instead had to explain the basis for its proposal that the Director impose an additional penalty upon plaintiff in the form of a $44,000 fine. Furthermore, we observe that after the two-page order was drafted, it had to be circulated to the other Board members, as evidenced by the fact that the Board decision contained in the record consists of three copies of the two-page order, each signed by one of the three Board members.

Thus, under the circumstances presented, we believe that the Department complied with the statutory requirement that it promptly determine plaintiff's case. Because we conclude that the Department complied with statutory mandates, the case is distinguishable from *Lyon*, where the supreme court found it "constitutionally inappropriate" for the Department of Children and Family Services to allow a teacher's name to be listed as an indicated sex offender on its register, based only upon the Department's conclusion that the charges against him were supported by credible evidence, passed the specific statutory deadlines requiring the Department to issue its final decision within 45 days of the end of the evidentiary hearing and within 90 days of

the request for the hearing. *Lyon*, 209 Ill. 2d at 274-75, 282. In this case, although plaintiff's license was suspended on a summary basis, he was afforded a prompt hearing and resolution of his case. Accordingly, we conclude that the 222 days it took the Director to issue the final agency decision after the conclusion of the hearing before the ALJ did not violate plaintiff's right to due process.

Plaintiff contends that his suspension should be reversed based upon this court's decision in his previous appeal, *Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 304-05 (2007) (hereinafter *Morgan I*), where we reversed the suspension of his license based on our conclusion that the Department did not decide his case in a sufficiently prompt manner after summarily suspending his license. In that case, however, the Department took approximately 13 months to issue a final decision suspending his license for 3 months and the circuit court intervened 6¹/₂ months after plaintiff's summary suspension by issuing a temporary restraining order reinstating his license. *Morgan I*, 374 Ill. App. 3d at 282-85. We concluded that even if the ALJ and Director were each given the 60 days allotted to the Board under section 16.1 of the Licensing Act (225 ILCS 15/16.1 (West 2006)), giving the Department a total of 180 days from the end of the ALJ hearing in which to issue a final decision, a period we deemed unwarranted under the circumstances of that case, that period was exceeded by 14 days by the time the Director issued his decision. *Morgan I*, 374 Ill. App. 3d at 304.

Nowhere in *Morgan I* did this court imply that, under no circumstances, could the Department take longer than 180 days to issue a final decision. Indeed, in describing the "promptness" requirement imposed by the Illinois Administrative Procedure Act (5 ILCS 100/10—65(d) (West 2004)), we noted that the meaning of the word "promptly" " 'depends largely on the facts in each case, for what is "prompt" in one situation may not be considered such under other circumstances and conditions. To do something "promptly" is to do it without delay and with reasonable speed.' " *Morgan I*, 374 Ill. App. 3d at 298, quoting Black's Law Dictionary 1214 (6th ed. 1990). We further held that the use of the term "promptly" in the Act was "particularly appropriate in light of the fact that the requirements of due process are variable in nature." *Morgan I*, 374 Ill. App. 3d at 298. Due process, the Supreme Court observed, " 'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances,' " but rather is " 'flexible and calls for such procedural protections as the particular situation demands.' " *Mathews v. Eldridge*, 424 U.S. 319, 334, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 902 (1976), quoted in *Morgan I*, 374 Ill. App. 3d at 298. We further

concluded that "what can be considered prompt will depend on the particular time, place, and circumstances involved." *Morgan I*, 374 Ill. App. 3d at 298.

We find the facts of *Morgan I* distinguishable from the case at bar. Unlike in *Morgan I*, where the ALJ, Board, and Director unreasonably took 106 days, 135 days, and 168 days respectively, to complete their steps of the administrative process, in this case, the ALJ, Board, and Director took considerably shorter and more reasonable 75-, 71-, and 77-day periods respectively to decide a more complicated case. While the number of days of testimony and exhibits to be considered by the ALJ in this case were only slightly greater those than in *Morgan I* (*Morgan I* had four days of testimony and seven witnesses, whereas the hearing in this case lasted five days and involved nine witnesses), the ALJ in the earlier case was required to weigh the testimony of only one complaining witness, who was in good mental health. *Morgan I*, 374 Ill. App. 3d at 279 (complaining witness E.S. testified that she and her husband were referred to plaintiff for marriage counseling). In this case by contrast, the ALJ was required to consider the testimony of four complaining witnesses, each of whom suffered from serious mental illnesses. Before making credibility determinations as to these witnesses, the ALJ had to take a reasonable period of time to familiarize himself with each woman's medical records and prescription drug forms and consider their testimony in light of that evidence. Additionally, only five counts were considered by the ALJ in *Morgan I*, whereas here, the ALJ was required to consider 22 counts, which together alleged the violation of seven different ethical guidelines. In sum, *Morgan I* involved different circumstances and does not alter our conclusion that the Department did not violate plaintiff's right to due process in the instant matter.

## CONCLUSION

In sum, we find that the Director's decision to suspend plaintiff's license based upon his improper conduct with J.L., K.T., and S.-G.N. and his failure to maintain medical records was neither arbitrary and capricious nor contrary to the manifest weight of the evidence. We also reject plaintiff's claims that numerous evidentiary rulings made by the ALJ during the hearing were erroneous and that the administrative complaint failed to provide him with sufficient notice of the charges against him. Furthermore, we conclude that the Director did not violate plaintiff's right to due process by taking 222 days to issue his final agency decision. For all the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

CAHILL, J., concurs.

JUSTICE JOSEPH GORDON, dissenting:

I cannot concur with the conclusion reached by the majority that the lag time of approximately nine months between the imposition of the interim summary suspension on February 23, 2005, and the final disposition on November 17, 2005, is justifiable under the standards imposed by our supreme court in *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 807 N.E.2d 423 (2004). Nor are the facts surrounding the delay sufficiently differentiated from those involved in *Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 871 N.E.2d 178 (2007) (hereinafter *Morgan I*), to justify a departure from the conclusion reached in that earlier decision.

As respondent correctly notes, the facts underlying our decision in *Morgan I* are similar to those presented in the case at bar. In that case, as here, the Department filed an administrative complaint alleging that respondent engaged in unethical sexual conduct with a female patient and praying for the suspension of his license. *Morgan I*, 374 Ill. App. 3d at 277-78, 871 N.E.2d at 181-82. On November 4, 2003, the same day that the Department filed its complaint, the Director conducted an *ex parte* telephonic hearing at which only a Department investigator testified, and summarily suspended respondent's license to practice clinical psychology because that testimony indicated that his continued practice constituted a danger to public safety. *Morgan I*, 374 Ill. App. 3d at 278, 871 N.E.2d at 182. A full evidentiary hearing on respondent's suspension commenced on December 4, 2003, and continued on December 5, 11, 12, and 15, 2003. *Morgan I*, 374 Ill. App. 3d at 278-79, 871 N.E.2d at 182. On March 31, 2004, the ALJ issued her "report and recommendation," in which she found that the Department had proven by clear and convincing evidence that respondent had engaged in unethical, unauthorized, or unprofessional conduct with regard to his treatment of a patient and recommended to the Board that his license be suspended for 60 days, and that he be required to serve a period of probation and complete 12 hours of continuing education on ethics. *Morgan I*, 374 Ill. App. 3d at 282-83, 871 N.E.2d at 186. No decision from the Board was forthcoming until August 13, 2004, at which time the Board recommended to the Director that he adopt the findings of fact of the ALJ and impose a 90-day suspension. *Morgan I*, 374 Ill. App. 3d at 284-85, 871 N.E.2d at 187. After the Board's decision, respondent filed a motion for rehearing, which the Director denied, and the Director issued a decision adopting the Board's recommendations on January 28, 2005, and deeming the 90-day suspension to be considered served by the previous summary suspension. *Morgan I*, 374 Ill. App. 3d at 285, 871 N.E.2d at 187.

In the interim, Morgan filed a motion for a temporary restraining order to stay his summary suspension, which the chancery division granted on June 29, 2004, barring the Department from enforcing the summary suspension because the Director had not yet filed his final decision. *Morgan I*, 374 Ill. App. 3d at 283-84, 871 N.E.2d at 186-87. Respondent appealed the matter to the circuit court, which affirmed the Director's decision. *Morgan I*, 374 Ill. App. 3d at 285, 871 N.E.2d at 187.

On appeal, respondent argued, in part, that the Department violated his right to due process by not issuing a final decision promptly after the summary suspension of his license. *Morgan I*, 374 Ill. App. 3d at 298-99, 871 N.E.2d at 197-98. In reliance on our supreme court's decision in *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 807 N.E.2d 423 (2004), we reversed the decision of the circuit court, which had affirmed the decision of the director. *Morgan I*, 374 Ill. App. 3d at 299-302, 871 N.E.2d at 197-201. As emphasized in *Lyon*, a professional's interest in his chosen profession is protected under the due process clause of our constitution, which is violated by an unjustifiably prolonged summary suspension. *Lyon*, 209 Ill. 2d at 281, 807 N.E.2d at 436.

Applying the principles of *Lyon*, which is aptly summarized by the majority, this court in *Morgan I* reversed the Department's suspension of respondent on grounds that it failed to promptly issue a final agency decision after summarily suspending his psychologist's license. In so doing, we noted that, as in *Lyon*, the initial standard of proof employed by the Department in determining whether to suspend respondent's license on a summary basis, which required only that the evidence in the Department's possession, indicate " 'that the continuation of practice by the clinical psychologist would constitute an imminent danger to the public,' " was far less stringent than the preponderance standard. *Morgan I*, 374 Ill. App. 3d at 302, 871 N.E.2d at 200, quoting 225 ILCS 15/21.6 (West 2002). We continued:

> "While, in *Lyon*, the statute and regulations themselves provided specific time frames in which the agency was supposed to act, the requirement that a hearing be held and determined without delay applies equally here, where the only specific time frame that the Act provides with regard to the agency's determination is the 60 days allotted to the Board to transmit its finding and recommendations to the Director (see 225 ILCS 15/16.1 (West 2002)). However, *** the Act further contains the overall requirement that proceedings following a summary suspension be 'promptly instituted and determined.' Accordingly, we address the other *Mallen* factors, the importance of the private interest and the government's justifica-

tion for the delay, in light of *Lyon*'s instruction that where an agency uses a lower standard of proof to support a prehearing deprivation, the necessity of acting promptly is heightened." *Morgan I*, 374 Ill. App. 3d at 302, 871 N.E.2d at 200. We then observed that respondent's interest in being able to continue his profession was substantial, as was the Department's interest in preventing sexual misconduct by clinical psychologists licensed under its authority (*Morgan I*, 374 Ill. App. 3d at 302, 871 N.E.2d at 200), but concluded that the Department's delays in issuing its final decision, particularly the Director's failure to issue his decision until five months after the Board issued its recommendations, were without justification (*Morgan I*, 374 Ill. App. 3d at 302-03, 871 N.E.2d at 200-01). We acknowledged, however, that respondent's due process rights were only affected for $6^1/2$ months after the conclusion of the hearing, because of the circuit court's entry of a temporary restraining order allowing respondent to continue the practice of his profession on June 29, 2004. *Morgan I*, 374 Ill. App. 3d at 303, 871 N.E.2d at 201. We concluded that this shortened period also violated respondent's due process rights because the Department could have promptly issued its final decision in, at the most, 120 days after the close of the hearing. *Morgan I*, 374 Ill. App. 3d at 303-04, 871 N.E.2d at 201-02. We specifically stated:

"As noted, section 16.1 of the Act describes the three stages involved in reaching a final decision after a hearing: first, the hearing officer reports her findings to the Board and the Director; next, the Board has 60 days after receiving the hearing officer's report to issue its findings and a recommendation to the Director; and, third, the Director issues a final decision. See 225 ILCS 15/21.6 (West 2002). Additionally, if the Board does not issue its recommendation to the Director within 60 days, the Director may issue an order based on the hearing officer's report. See 225 ILCS 15/21.6 (West 2002). Thus, although presented in terms of an internal departmental deadline rather than a deadline directly affecting a subject's rights, the Act explicitly contemplates a delay of at least 60 days in reaching a decision after a hearing. It can be presumed that the Act also tacitly contemplates that the hearing officer (the ALJ in this case) and the Director will require a reasonable amount of time to complete their portions of the process.

Strong argument can be made that those steps of the process designated to the ALJ and the Director should not each exceed the 60 days allotted to the Board. The ALJ, having presided over the hearing, presumably has a ready familiarity with the case by the time the hearing concludes. The same cannot be said of the Board, which may or may not have attended the hearing. *** Similarly,

there is strong argument to be made that the Director's portion of the process should not exceed an additional 60 days since he would have received the ALJ's report contemporaneously with the Board and would, therefore, already be familiar with the matter. Thus, it would appear that the final decision could reasonably have been finalized in as little as four months, allowing 30 days for the ALJ, 60 days for the Board, and an additional 30 days for the Director thereafter." *Morgan I*, 374 Ill. App. 3d at 303-04, 871 N.E.2d at 201-02.

We then noted that even if it were reasonable for the ALJ and Director to each take 60 days to make their determinations, giving the Department 180 days total, that time frame would have been exceeded by approximately 14 days by the time the circuit court issued its temporary restraining order. *Morgan I*, 374 Ill. App. 3d at 304, 871 N.E.2d at 202.

Applying these principles to the case at bar, I am compelled to find, contrary to the majority, that the Department did violate respondent's right to due process by failing to decide the matter in a prompt manner. The Director summarily suspended respondent's license to practice psychology on February 23, 2005, after concluding that the evidence produced by a Department investigator at an *ex parte* hearing indicated "that the continuation of practice by the clinical psychologist would constitute an imminent danger to the public." The low standard of proof applied at this stage of the proceedings, which was accompanied by a higher risk that respondent was erroneously found to be such a danger, did not automatically deprive respondent of his due process rights, because the Department was subsequently required to prove respondent's misconduct by the more stringent clear and convincing evidence standard. *Lyon*, 209 Ill. 2d at 282, 807 N.E.2d at 436. Nevertheless, this distribution of the risk of error became problematic when the Department failed to decide this matter in a prompt manner. *Lyon*, 209 Ill. 2d at 282, 807 N.E.2d at 436.

As noted in *Morgan I*, when an agency summarily suspends a license in an attempt to safeguard the public, as the Department did here, the subsequent proceedings must be "promptly instituted and determined." 5 ILCS 100/10—65(d) (West 2004). According to Black's, "[t]he meaning of the word ['promptly'] depends largely on the fact in each case, for what is 'prompt' in one situation may not be considered such under other circumstances or conditions. To do something 'promptly' is to do it without delay and with reasonable speed." Black's Law Dictionary 1214 (6th ed. 1990), citing *In re Application of Beattie*, 54 Del. 506, 512, 180 A.2d 741, 744 (1962); see also New American

Webster's Dictionary 365 (1972) (defining "prompt" as "quick to act; given without delay; on time"). Here, the Director failed to promptly issue his decision within the 120-day time frame articulated in *Morgan I*. The hearing on the suspension ended on April 8, 2005, but the ALJ did not issue his report until 75 days later, on June 22, 2005. The Board then took 71 days to issue its recommendations to the Director on September 1, 2005, and the Director took an additional 77 days to issue the final agency decision on November 17, 2005. Thus, 223 days transpired between the end of the hearing and the Director's decision, 103 days longer than the 120-day period we considered to be prompt in *Morgan I*. *Morgan I*, 374 Ill. App. 3d at 304, 871 N.E.2d at 202. Moreover, even if we were to consider that the 60 days allotted to the Board could also be extended to the ALJ and the Director, thus giving the Department a total of 180 days to make its decision, the final decision here would have been 43 days late.

The Department nevertheless argues that our holding in *Morgan I* notwithstanding, the Department in this case should not be bound to enter its final agency decision within 120 days following the hearing because of delays which were beyond its control. First, it argues that the ALJ had to wait until April 29, 2005, when a transcript of the last day of the hearing, April 8, 2005, was prepared, and therefore "acted promptly when he issued his recommendation less than 60 days later on June 22, 2005." In support of its contention that the ALJ was entitled to a transcript to use in preparing his report, the Department cites section 19 of the Clinical Psychologist Licensing Act (225 ILCS 15/19 (West 2004)), which states that the Department, at its expense, shall preserve a record of all proceedings at any formal hearing of any case and section 10—35(c) of the Administrative Procedure Act (5 ILCS 100/10—35(c) (West 2004)), which requires that "[f]indings of fact shall be based exclusively on the evidence and on matters officially noticed."

With due deference to the majority, I cannot find merit in this argument. First, Illinois law does not require that the ALJ have a transcript of the hearing to help him as he drafts his recommendations. Although the Clinical Psychologist Licensing Act requires the Department to preserve a record of all administrative proceedings (225 ILCS 15/19 (West 2004)), and the Civil Administrative Code requires the Department, at its expense, to provide a stenographer to take down the testimony and preserve a record of all proceedings at the hearing of any case in which a certificate may be revoked or suspended (20 ILCS 2105/2105—115 (West 2004)), there is no indication that these requirements were imposed upon the ALJ as a prerequisite for drafting his recommendations. Indeed, both Acts state

that the record of proceedings, which the Department is required to maintain, shall include the "report of the Board" (225 ILCS 15/19 (West 2004); 20 ILCS 2105/2105—115 (West 2004)), a document drafted after the ALJ makes his recommendation (225 ILCS 15/21.6 (West 2004)). Likewise, I cannot agree with the Department's claim that the ALJ had to wait for the transcript because section 35(c) of the Illinois Administrative Procedure Act requires that "[f]indings of fact shall be based exclusively on the evidence and on matters officially noticed" (5 ILCS 100/10—35(c) (West 2004)), as that statute merely stands for the proposition that the ALJ cannot base his decision on facts outside the record (see *Mel-Park Drugs, Inc. v. Department of Revenue*, 218 Ill. App. 3d 203, 223, 577 N.E.2d 1278, 1291 (1991) (recommendation of ALJ properly rejected because recommendation was based on data not introduced into evidence in contravention of section 11(c) of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1987, ch. 127, par. 1011(c)))).

Furthermore, even if the ALJ was entitled to a complete transcript before drafting his report, in keeping with the strict time constrictions imposed under *Lyon*, the Department may not wait passively and indefinitely for such a transcript, but must act reasonably to request that the transcript be produced punctually. As noted above, the Department was statutorily obligated to bear the cost of the transcription services (20 ILCS 2105/2105—115 (West 2004)), and presumably could have requested that the 124-page transcription of the portion of the hearing which occurred on April 8, 2005, be produced considerably sooner than April 29, 2005, three weeks after the close of evidence. Indeed, the feasibility of such a quick transcription is evidenced by the fact that the slightly longer 133-page transcription of the proceedings of March 9, 2005, took only one week to complete. Any burden that may have been imposed on the Department in securing the punctual transcription of the last day of proceedings was clearly outweighed by the respondent's interest in having the propriety of the summary suspension of his license promptly decided.

More significantly, in any event, the record reveals no compelling reason why the ALJ needed until June 22, 2005, to complete his recommendation after the transcript was completed on April 29, 2005. After presiding over the hearing, the ALJ presumably was readily familiar with the case, and could have quickly completed his recommendation after receiving the last transcript. *Morgan I*, 374 Ill. App. 3d at 304, 871 N.E.2d at 202. Accordingly, I find that the ALJ did not issue his recommendation with reasonable promptness, as required under *Lyon*.

The Department next argues, and the majority concurs, that the Board was reasonable in taking 71 days to issue its report after the

ALJ issued its recommendations on June 22, 2005, instead of 60 days as contemplated by statute, because the Board was obligated to decide the matter at an open meeting under the Open Meetings Act (5 ILCS 120/1.02 (West 2006)), and its first meeting after the ALJ issued its recommendation was held on July 29, 2005. It notes that the Board members decided at that meeting to revoke respondent's license for a minimum of five years and fine him $44,000 and an order to that effect was signed on September 1, 2005.

However, the Department offers no explanation as to why the Board did not issue its two-page decision, which merely incorporated the ALJ's recommendations and contained a brief explanation for its imposition of an additional fine, until September 1, 2005, after the 60-day period allotted to it by section 21.6 of the Clinical Psychologist Licensing Act (225 ILCS 15/21.6 (West 2004)) had expired, if the Board made its decision on July 29, 2005. To the extent the Board was prevented from issuing its recommendation within 60 days because of the fact that it did not have a regular meeting until 37 days after the ALJ issued his recommendation, I question why the Board could not have moved that meeting to an earlier date as long as it provided 10 days' prior notice to the public. 5 ILCS 120/2.03 (West 2004) ("If a change is made in regular meeting dates, at least 10 days' notice of such change shall be given by publication in a newspaper of general circulation in the area in which such body functions").

The Department next contends, and the majority agrees, that the Director acted reasonably when he issued his final decision on November 17, 2005, 77 days after the Board filed its recommendation on September 1, 2005, instead of within 30 days, a period which we determined to be reasonable in *Morgan I*. It argues that the 30-day period articulated in *Morgan I* failed to take into account the fact that section 20 of the Clinical Psychologist Licensing Act (225 ILCS 15/20 (West 2004)) permits a licensee to file a motion for rehearing within 20 days of the Board's decision and states that the Director may enter an order upon the denial of such a motion. In this case, the Department notes, respondent filed a motion for rehearing on September 16, 2005, the Department filed a response to the motion on October 12, 2005, respondent filed a reply in support of his motion on November 1, 2005, and the Director issued his final decision soon after on November 17, 2005. Under these circumstances, it argues, the Director's decision should be considered promptly issued.

Although the Clinical Psychologist Licensing Act does permit a licensee to file a motion for rehearing, nothing in the Act grants the Department authority to file a response thereto. Indeed, the rules of practice governing administrative hearings for the Department of

Financial and Professional Regulation state that when a written motion such as a motion for rehearing is filed, the "Committee, hearing officer or Director may allow oral argument if this is deemed necessary to a fuller understanding of the issues presented." 68 Ill. Adm. Code §1110.210(b), amended at 28 Ill. Reg. 7642, eff. May 21, 2004. It does not state that the Department may file a response brief as it did in this case. Thus, after respondent filed his motion for rehearing on September 16, 2005, the Director had the discretion to call the parties to an oral argument on the motion or simply begin his deliberations on the motion and the final agency decision.

More overridingly, even if the Department was entitled to file a response, it should have been required to do so in no more than 20 days, the same amount of time respondent was given to file his initial motion under section 20 of the Clinical Psychologist Licensing Act (225 ILCS 15/20 (West 2004)). Even if we were to subtract those 20 days, as well as the 20 days it took respondent to voluntarily file his reply, from the time period between the last day of the hearing, April 8, 2005, and the Director's decision, November 17, 2005, the Department took 183 days to issue a final decision—an effort that cannot, even under the most overindulgent view, be said to be "without delay and with reasonable speed." See Black's Law Dictionary 1214 (6th ed. 1990) (defining "prompt").

The Department nevertheless argues that the requirement that it decide matters such as the one at bar in a prompt manner improperly benefits the worst offenders because there "would be more counts to their complaints and more testimony and exhibits for the Department to consider, and, therefore, more obstacles in the way of meeting the inflexible time frames" imposed by *Morgan I*. I disagree. Whether an agency action will be considered prompt "depends largely on the facts in each case, for what is 'prompt' in one situation may not be considered such under other circumstances or conditions." Black's Law Dictionary 1214 (6th ed. 1990). My decision in this case is based, not on the Department's failure to meet an inflexible 120-day deadline, but rather the Department's failure to act with reasonable speed under the circumstances, as dictated by the supreme court in *Lyon*, which we applied in *Morgan I*.

Although I fully recognize that respondent was found guilty of repetitive conduct which egregiously betrayed his patients' trust and the responsibilities of his profession, it cannot relieve our transcendent duty to enforce the procedural safeguards extended to every person under the due process clause of our constitution as promulgated by our supreme court in *Lyon*. These safeguards ultimately protect an innocent practitioner from the ravages to his chosen career which may

accompany the unnecessarily prolonged disposition of a summary suspension based upon the *ex parte* presentation of an investigator's report, where he is ultimately vindicated after an evidentiary hearing is conducted under the preponderance standard. By diluting the strict due process standards imposed by *Lyon*, where, as in this case, the licensee's guilt is ultimately sustained under the preponderance standard, we dilute those standards for the licensee who is ultimately exonerated after an evidentiary hearing. We cannot maintain a dual standard. Setting aside the ultimate disposition where the delay was unjustifiable for the culpable licensee is the only means by which to expedite the process for the licensee who is ultimately vindicated. Otherwise, such vindication may be hollow after the licensee's professional career may have been irretrievably damaged by the unjustifiably prolonged summary suspension. Obviously, such damage to a licensee who is ultimately exonerated cannot be undone by setting aside his ultimate disposition since it is the ultimate disposition that established his innocence. Thus, only by setting aside the ultimate disposition of the culpable licensee can the rights of the innocent licensee be protected against unjustifiably prolonged summary suspension.

For that reason, and only that reason, finding the remainder of the majority's opinion thoughtful and well reasoned, I respectfully dissent.